[L.A. No. 31701. Apr. 20, 1984.]

BARBARA HARTZELL et al., Plaintiffs and Appellants, v.
MARGARET A. CONNELL et al., Defendants and Respondents.

**COUNSEL**

Kirk Ah Tye, M. Carmen Ramirez, Moises Vazquez, Stephen P. Wiman and Ignacio S. Cota for Plaintiffs and Appellants.

Palley & Palley, David B. Palley, Thomas M. Griffin and Roger D. Wolfertz as Amici Curiae on behalf of Plaintiffs and Appellants.

Thomas P. Anderle for Defendants and Respondents.

Robert G. Walters, Christian M. Keiner, Walters, Bukey & Shelburne, Biddle, Walters & Bukey, Breon, Galgani, Godino & O'Donnell, Keith V. Breon, Robert A. Galgani, Richard J. Tomoda, John H. Larson, County Counsel (Los Angeles), and Nancy O'Hara, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**BIRD, C. J.**—May a public high school district charge fees for educational programs simply because they have been denominated "extracurricular"?

## I.

The Santa Barbara High School District (District) offers a wide variety of extracurricular activities, ranging from cheerleading to madrigal singing, and from archery to football. Many of these activities are of relatively recent origin. For example, in 1956, Santa Barbara High School fielded six athletic teams while today there are thirty-eight.

Prior to the 1980-1981 school year, any student could participate in these activities free of charge. The programs were financed by a combination of District contributions (mostly state aid and local tax revenues), ticket sales, and fundraising activities conducted by the constituent high schools.

In the spring of 1980, the District school board (Board) decided to cut its budget by $1.1 million. This decision reflected a drop in revenues due to the combined effects of inflation, declining enrollment, and the adoption of Proposition 13.[1] Among the items to be reduced was the District's contribution to the high school extracurricular programs.

The Board considered two plans for adapting the programs to fit its reduced budget. The first plan called for a major cut in interscholastic athletic competition, including the reduction of the high school program from over 30 teams to only 8 and the elimination of interscholastic competition at the ninth grade level. Under this plan, the surviving programs were to remain open to all students free of charge.

The second plan provided for a less extensive cut in athletic competition—elimination of the ninth grade program only. To make up the difference, it proposed to raise money by charging students fees for participation in dramatic productions, musical performances, and athletic competition.

The Board chose the second option. Under the plan finally adopted, students are required to pay $25 for *each* athletic team in which they wish to participate, and $25 per category for any or all activities in *each* of the following four categories: (1) dramatic productions (e.g., plays, dance performances, and musicals); (2) vocal music groups (e.g., choir and madrigal groups); (3) instrumental groups (e.g., orchestra, marching band, and related groups such as the drill team and flag twirlers); and (4) cheerleading groups.

Thus, a student who desires to play football in the fall and tennis in the spring, in addition to participating in a dramatic production, must pay $75.

---

[1]Proposition 13, commonly known as the Jarvis-Gann initiative, was adopted by the voters in June of 1978. It enacted article XIII A of the California Constitution, which sharply limits the power of local and state governments to increase tax rates or enact new taxes.

A more musically inclined student, who plays an instrument, sings in a group, and performs in a musical, also pays $75.

None of the affected activities yield any credit toward graduation. However, each is connected to a credit course. For example, students enrolled in vocal music courses for credit spend much of their in-class time rehearsing for the noncredit performances. Similarly, students enrolled in the varsity football class spend much of their class time preparing for interscholastic competition. The trial court found that students could derive "some" value from the credit courses without participating in the noncredit performances. All parties are agreed that the activities are "important educational experiences" for the students.

According to the District's stated policy, students are given the option of participating in the credit course but not the fee-paid performance, or vice versa. Outside the drama program, no student chose either of these options during the first six months of the plan's operation.[2] In the drama program, students were permitted to participate in backstage aspects of the production without paying the fee. A number of students enrolled in the course and did not pay the fee, but the record does not reveal how many of these students elected to participate in the backstage activities which were open to them as nonfeepayers.

The teachers of the credit courses also supervise the noncredit performances. District policy prohibits them from considering the performances in calculating grades.[3]

Each of the affected activities is supervised by school personnel, nearly all of whom are teachers. The teachers are compensated by one of two methods: extra pay (in the form of a "stipend") or "release time." The stipends are paid partly from general school revenues (derived mostly from taxes) and partly from fees. Under the "release time" policy, teachers are "released" from one hour of regular teaching duties for each hour spent supervising extracurricular activities.

The activities are sponsored by the schools and their respective student bodies. School personnel handle preparations, including arrangements for facilities and ticket sales.

---

[2]Testimony was taken on March 10, 1981, about six months after the program took effect.

[3]The trial court made no finding on the actual effectiveness of this prohibition. Two school officials were asked whether a student's grade would depend upon the after-school performances. Both responded that it "should" not. One, the principal of San Marcos High School, further elaborated: "It would probably vary with the different instructors and/or coaches."

In an attempt to ensure that the fees would not prevent any students from participating, the District has implemented a fee-waiver program. Upon a showing of financial need, a student may obtain a "scholarship" to participate without paying the fee. The standard of need is similar to that of the free lunch program.[4]

The fee-waiver policy has been supplemented with an outreach program. Teachers and coaches are asked to inform their principals of any students who, though expected to participate in an activity, do not do so. These students are then interviewed by the principal to determine whether the fee prevented them from participating.

The District's three high schools granted a total of seventy-seven waivers. Four students were denied waivers, but were permitted to delay payment. There was no evidence that any student was prevented from participating because of the fees.

Shortly before the start of the 1980-1981 school year, Barbara Hartzell, a taxpayer with two children in the public schools, and the Coalition Opposing Student Fees, a grouping of community organizations,[5] filed this taxpayers' action against the District, various school officials, and the members of the Board. Plaintiffs sought declaratory and injunctive relief, claiming that defendants' fee program violates the "free school" and equal protection guarantees of the California Constitution (Cal. Const., arts. IX, § 5, IV, § 16, I, § 7), that it is barred by title 5, section 350, of the California Administrative Code, and that it is preempted by state law.

The trial court rejected all of plaintiffs' claims, primarily on the ground that none of the activities covered by the fee program are "integral" to credit courses.

## II.

The California Constitution requires the Legislature to "provide for a system of common schools by which a *free school* shall be kept up and supported in each district . . . ." (Cal. Const., art. IX, § 5, italics added.)

---

[4]A student is eligible for the free lunch program if his family income is "not more than twenty-five percent above the income poverty guidelines prescribed by the United States Secretary of Agriculture for such family size." (Cal. Admin. Code, tit. 5, § 15510, subd. (b).)

[5]The Coalition includes the AfroAmerican Community Services, American Civil Liberties Union, Black Action Committee, Casa de la Raza, Community Action Commission, Gray Panthers, National Association for the Advancement of Colored People, Network, and the Social Concerns Committee of the Unitarian Church.

This provision entitles "the youth of the State . . . to be educated at the public expense." (*Ward* v. *Flood* (1874) 48 Cal. 36, 51.)

■ Plaintiffs assert that the imposition of fees for educational extracurricular activities violates the free school guarantee. They are correct.

The first question raised by plaintiffs' challenge is whether extracurricular activities fall within the free education guaranteed by section 5. California courts have not yet addressed this issue. The reported decisions from other jurisdictions reveal two distinct approaches.

One approach restricts the free school guarantee to programs that are "essential to the prescribed curriculum." (*Smith* v. *Crim* (1977) 240 Ga. 390, 391 [240 S.E.2d 884]; see also *Paulson* v. *Minidoka County School District No. 331* (1970) 93 Idaho 469, 472 [463 P.2d 935].) Under this view, the right to an education does not extend to activities that are "outside of or in addition to the regular academic courses or curriculum of a school." (*Paulson, ibid.*, fn. omitted.) Accordingly, it has been held that students have no right to participate in extracurricular activities. (*Smith* v. *Crim, supra*, 240 Ga. at p. 391; see also *Granger et al.* v. *Cascade Co. Sch. Dist.* (1972) 159 Mont. 516 [499 P.2d 780].[6])

The second approach holds that the free school guarantee extends to all activities which constitute an "integral fundamental part of the elementary and secondary education" or which amount to " 'necessary elements of any school's activity.' " (*Bond* v. *Ann Arbor School District* (1970) 383 Mich. 693, 702 [178 N.W.2d 484, 41 A.L.R.3d 742]; see also *Moran* v. *School District #7, Yellowstone County* (D. Mont. 1972) 350 F.Supp. 1180, 1184.) Courts applying this approach have held that "the right to attend school includes the right to participate in extracurricular activities." (*Moran, ibid.*)

---

[6]*Granger,* cited by both parties, appears to straddle the two approaches identified here. The trial court had enjoined fees for "required" activities, but not for "optional or extracurricular" activities. (*Id.,* at pp. 526-527.) The Montana Supreme Court altered the standard to encompass all courses and activities "reasonably related to a recognized academic and educational goal of the particular school system." (*Id.,* at p. 527.) This alteration of the standard appears to have been grounded in the court's desire to include optional, credit courses within the guarantee. (*Ibid.*)

As this court interprets the *Granger* standard, it would prohibit the defendants' fee program because each of the performance activities involved is "reasonably related" to an optional, credit course. Indeed, preparation for the performances appears to be a major function of the credit courses.

However, nothing in the *Granger* standard would prevent local districts from evading the free school guarantee by the simple expedient of offering the underlying courses on an "extracurricular" basis. Nor would *Granger* prevent a district from offering any number of courses, for example advanced algebra or computer science, on a noncredit basis for a fee. Hence, *Granger,* in spite of its broadly stated holding, does not fundamentally depart from the "prescribed curriculum" standard.

In particular, courts have struck down extracurricular activities fees as unconstitutional. (See *Bond* v. *Ann Arbor School District, supra,* 383 Mich. at p. 698; *Pacheco* v. *Sch. Dist. No. 11* (1973) 183 Colo. 270 [516 P.2d 629].[7])

To determine which, if either, of these approaches is consistent with California's free school guarantee, this court must examine the role played by education in the overall constitutional scheme. Because the nature of the free school concept has rarely been addressed by the courts, it will be necessary to explore its underpinnings in some depth.

The free school guarantee was enacted at the Constitutional Convention of 1878-1879. Also adopted was article IX, section 1, which proclaims that "[a] general diffusion of knowledge and intelligence [is] essential *to the preservation of the rights and liberties of the people . . . .*" (Italics added.) Joseph W. Winans, chairperson for the convention's Committee on Education, elaborated: "Public education forms the basis of self-government and constitutes the very corner stone of republican institutions." (Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 1087 [hereafter Proceedings].)[8] In support of section 1, delegate John T. Wickes argued that "a liberal education . . . breaks down aristocratic caste; for the man who has a liberal education, if he has no money, if he has no wealth, he can stand in the presence of his fellow-men with the stamp of divinity upon his brow, and shape the laws of the people . . . ." (Proceedings, at p. 1088.)

This theme runs like a unifying thread through the writings of our forefathers. In 1786, Thomas Jefferson wrote from France, then a monarchy: "I think by far the most important bill in our whole code is that for the

---

[7]In *Bond,* the trial court had held interscholastic athletic fees to be unconstitutional and had issued a permanent injunction barring their future collection. (383 Mich. at p. 698.) Neither party raised the constitutionality of the fees before the Michigan Supreme Court, which let the injunction stand.

In *Pacheco,* the trial court had held that a school policy requiring the purchase of an activities card as a precondition for participating in extracurricular activities such as athletic contests, dances, plays, and concerts, violated the free school guarantee as applied to children of indigent parents. (183 Colo. at pp. 272-273.) The Colorado Supreme Court upheld the trial court's action without ruling on the constitutionality of such fees as applied to children of nonindigent parents. (*Id.,* at pp. 273-275.)

Justice Kelley dissented from the court's refusal to reach this issue, reasoning that "the entire educational program is required to be provided to all students 'gratuitously.'" (*Id.,* at p. 280.)

[8]In quoting the remarks of delegates, this court is not suggesting that such remarks are authoritative on the question of construction. (See *Helping Hand Home* v. *San Diego* (1938) 26 Cal.App.2d 452, 457 [79 P.2d 778].) However, they are—at a minimum—useful in evaluating the historical and social context of the provisions. (See generally Tribe, *Toward a Syntax of the Unsaid: Construing the Sounds of Congressional and Constitutional Silence* (1981-1982) 57 Ind. L.J. 515.)

diffusion of knowledge among the people. No other sure foundation can be devised for the preservation of freedom, and happiness. . . . Preach, my dear Sir, a crusade against ignorance; establish and improve the law for educating the common people. Let our countrymen know that the people alone can protect us against these evils [of kings, nobles, and priests]." (Jefferson, *Letter to George Wythe,* in The Portable Thomas Jefferson (Peterson edit. 1979) pp. 399-400.)

John Swett, California's most prominent free school advocate at the time section 5 was adopted, warned: "Our destruction, should it come at all, will be . . . . [f]rom the inattention of the people to the concerns of their government . . . . I fear that they may place too implicit confidence in their public servants and fail properly to scrutinize their conduct . . . . Make them intelligent, and they will be vigilant; give them the means of detecting the wrong, and they will apply the remedy." (Quoted in Cloud, The Story of California's Schools (194?) p. 20.) Without education for all, a majority of the people would be—in the words of Horace Mann—"the vassals of as severe a tyranny, in the form of capital, as the lower classes of Europe are bound to in the form of brute force." (Mann, *Twelfth Annual Report,* in Educational Ideas in America: A Documentary History (Rippa edit. 1969) p. 199.)

Perhaps the most eloquent expression of the free school idea came not from a political leader or educator, but from the poet, Ralph Waldo Emerson: "We have already taken, at the planting of the Colonies, . . . the initial step, which for its importance might have been resisted as the most radical of revolutions, thus deciding at the start the destiny of this country,—this, namely, that the poor man, whom the law does not allow to take an ear of corn when starving, nor a pair of shoes for his freezing feet, is allowed to put his hand into the pocket of the rich, and say, You shall educate me, not as you will, but as I will: not alone in the elements, but, by further provision, in the languages, in sciences, in the useful and in elegant arts." (Emerson, *Education,* in Educational Ideas in America: A Documentary History, *supra,* at p. 176.)

The contribution of education to democracy has a political, an economic, and a social dimension.

As this court has previously noted, education prepares students for active involvement in political affairs. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 607-608 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] [hereafter, *Serrano I*].)[9] Education stimulates an interest in the political process and

_____

[9]See also *Board of Education* v. *Pico* (1982) 457 U.S. 853, 868 [73 L.Ed.2d 435, 447, 102 S.Ct. 2799] (plurality opn.) ("[A]ccess to ideas . . . prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members").

provides the intellectual and practical tools necessary for political action. Indeed, education may well be "the dominant factor in influencing political participation and awareness." (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 114, fn. 72 [36 L.Ed.2d 16, 90, 93 S.Ct. 1278] (dis. opn. of Marshall, J.).) With the rise of the electronic media and the development of sophisticated techniques of political propaganda and mass marketing, education plays an increasingly critical role in fostering "those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion" (*Wieman* v. *Updegraff* (1952) 344 U.S. 183, 196 [97 L.Ed. 216, 225, 73 S.Ct. 215] (conc. opn. of Frankfurter, J.)). Without high quality education, the populace will lack the knowledge, self-confidence, and critical skills to evaluate independently the pronouncements of pundits and political leaders. Moreover, education provides more than intellectual skills; it also supplies the practical training and experience—from communicative skills to experience in group activities—necessary for full participation in the "uninhibited, robust, and wide-open" debate that is central to our democracy (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 701, 84 S.Ct. 710, 95 A.L.R.2d 1412]).

Not only does education provide skills useful in political activity, it also prepares individuals to participate in the institutional structures—such as labor unions and business enterprises—that distribute economic opportunities and exercise economic power. Education holds out a "bright hope" for the "poor and oppressed" to participate fully in the economic life of American society. (*Serrano I, supra,* 5 Cal.3d at p. 609.) And, it is "an essential step in providing the disadvantaged with the tools necessary to achieve economic self-sufficiency." (*San Antonio School District* v. *Rodriguez, supra,* 411 U.S. at p. 115, fn. 74 [36 L.Ed.2d at p. 91] (dis. opn. of Marshall, J.).)

Finally, education serves as a "unifying social force" among our varied population, promoting cohesion based upon democratic values. (*Serrano I, supra,* 5 Cal.3d at p. 608; see also *Ambach* v. *Norwick* (1979) 441 U.S. 68, 77 [60 L.Ed.2d 49, 56, 99 S.Ct. 1589].) The public schools bring together members of different racial and cultural groups and, hopefully, help them to live together " 'in harmony and mutual respect.' " (*Washington* v. *Seattle School Dist. No. 1* (1982) 458 U.S. 457, 473 [73 L.Ed.2d 896, 909, 102 S.Ct. 3187, 3196].)

Viewed in light of these constitutionally recognized purposes, the first of the two tests described above is insufficient to ensure compliance with California's free school guarantee. That approach determines whether a given program falls within the guarantee not by assessing its actual educational

value, but by deferring to a school board's decision on whether or not to offer it for formal, academic credit.[10] Under this test, a for-credit program would fall within the guarantee, while a noncredit program with identical content—and equal value in fulfilling the constitutionally recognized purposes of education—could be offered for a fee.[11]

The second approach, on the other hand, does not sever the concept of education from its purposes. It focuses not upon the formalities of credit, but upon the educational character of the activities in question.

It can no longer be denied that extracurricular activities constitute an integral component of public education. Such activities are "'generally recognized as a fundamental ingredient of the educational process.'" (*Moran* v. *School District #7, Yellowstone County, supra,* 350 F.Supp. 1180, 1184; *Kelley* v. *Metropolitan County Bd. of Ed. of Nashville, etc.* (M.D.Tenn. 1968) 293 F.Supp. 485, 493 [hereafter, *Kelley I*].)[12] They are "[no] less fitted for the ultimate purpose of our public schools, to wit, the making of good citizens physically, mentally, and morally, than the study of algebra and Latin . . . ." (*Alexander* v. *Phillips* (1927) 31 Ariz. 503 [254 P. 1056, 1059].)

In a variety of legal contexts, courts have emphasized the vital importance of student participation in educational extracurricular programs. For ex-

---

[10]This is not to suggest that a school board's decision to offer a program for credit is irrelevant as a measure of its educational value. However, as indicated by the numerous authorities cited below (*post,* at pp. 909-911), the fact that some activities are less suited to a formal, graded program does not mean that they are less essential to the goals of public education.

[11]Under this standard, the Constitution would not prevent a school board from evading the constitutional guarantee by the simple expedient of labelling courses "extracurricular" and offering them for no credit. In addition to the performances involved in the present case, metal working courses, computer instruction, language laboratories, or even advanced algebra could be offered for a fee.

[12]This conclusion echoes the views of many educational theorists. "A concept which finds general acceptance today is that which identifies the curriculum with the experiences of the pupil. . . . 'If the fundamental task of the school is to prepare children for life, the curriculum must be as wide as life itself. It should be thought of as comprising all the activities and the experiences afforded by the community through the school, whereby the children may be prepared to participate in the life of the community.'" (Johnston & Faunce, Student Activities in Secondary Schools (1952) pp. 6-7; see also Kilzer et al., Allied Activities in the Secondary School (1956) p. ix ["No longer is it possible to consider a large part of the non-instructional activities of the secondary school as merely *extra*-curricular. Many of these have become fundamentals of good education and are interwoven with the so-called curricular subjects until it is impossible to draw a clear-cut line of demarcation between them"]; Robbins & Williams, Student Activities in the Innovative School (1969) p. 42 [noncredit student activities are "an aspect of the curriculum"]; Frederick, Student Activities in American Education (1965) p. 3 ["(noncredit) (s)tudent activities, now a part of the American educative process, constitute . . . the third curriculum" (italics omitted)]; Gruber & Beatty, Secondary School Activities (1954) p. ix ["the student activity program is recognized as an essential, vital, and extensive part of the secondary school curriculum . . . ."].)

ample, in *Kelley* v. *Metropolitan Cty. Bd. of Ed.* (M.D.Tenn. 1980) 492 F.Supp. 167 (hereafter, *Kelley II*), the court struck down a school desegregation plan in part because it made no accommodation for students who desired to participate in after-school extracurricular activities, which constitute an "essential component of an education." (*Id.*, at p. 196.) Similarly, the court in *Lee* v. *Macon County Board of Education* (M.D.Ala. 1968) 283 F.Supp. 194 invalidated Alabama's system of segregation in interscholastic athletics partly because such activities are "integral" to Alabama's system of public education. (*Id.*, at p. 197.) And, in *Kelley I, supra,* 293 F.Supp. 485, a school board's suspension, without formal notice or hearing, of a high school's athletic programs was held to have violated students' due process rights in part because such programs constitute "a fundamental ingredient of the educational process." (*Id.*, at p. 493.)

Further, in *McGrath* v. *Burkhard* (1955) 131 Cal.App.2d 367 [280 P.2d 864], the court upheld a school board's assignment of teachers to supervise extracurricular activities, reasoning that such supervision is "an important part of [a teacher's] duties" because of the "great importance" of educating students in, among other things, principles of justice, fair play, and good citizenship. (*Id.*, at p. 376.)[13] Expenditures for such items as band uniforms have been upheld as "necessary" for instructional purposes. (*Kay County Excise Board* v. *Atchison, T. & S.F. Ry. Co.* (1939) 185 Okla. 327 [91 P.2d 1087, 1088-1089]; see also *Alexander* v. *Phillips, supra,* 254 P. at p. 1059 [approving construction of facility for interscholastic athletics on the ground that athletic competition is just as important to the purposes of public education as is instruction in academic subjects].)

Finally, in cases determining the scope of school-related tort liability and insurance coverage, courts have held that "school-sponsored activities, such as sports, drama, and the like," though denominated "'extracurricular,' . . . nevertheless form an integral and vital part of the educational program." (*Feaster* v. *Old Security Life Ins. Co.* (1965) 87 N.J.Super 339 [209 A.2d 354, 357], affd. (1966) 91 N.J.Super. 120 [219 A.2d 340]; see also *Boulet by Boulet* v. *Brunswick Corp.* (1983) 126 Mich.App. 240, 241 [336 N.W.2d 904, 905] ["A physical education program, as part of the general

---

[13]See also *Board of Ed., etc.* v. *Asbury Park Education Ass'n.* (1977) 155 N.J.Super. 76 [382 A.2d 392, 393] (The supervision of extracurricular activities is within the scope of a teacher's duties in part because "'extracurricular activities are an integral part of a child's education . . . .'"); *Parrish* v. *Moss* (1951) 200 Misc. 375 [106 N.Y.S.2d 577, 584], affd. 279 App.Div. 608 [107 N.Y.S.2d 580] (Supervision of extracurricular activities is within the scope of a teacher's duties in part because "'[t]he day in which the concept was held that teaching duty was limited to classroom instruction has long since passed. Children are being trained for citizenship and the inspiration and leadership in such training is the teacher.'")

curriculum *or as an extracurricular activity,* is in furtherance of and an integral part of the total public education provided to students" (italics added)].)

In addition to the particular skills taught, group activities encourage active participation in community affairs, promote the development of leadership qualities, and instill a spirit of collective endeavor. These results are directly linked to the constitutional role of education in preserving democracy, as set forth in article IX, section 1, and elaborated in *Serrano I, supra,* 5 Cal.3d at pages 607-609.

Accordingly, this court holds that all educational activities—curricular or "extracurricular"—offered to students by school districts fall within the free school guarantee of article IX, section 5. Since it is not disputed that the programs involved in this case are "educational" in character, they fall within that guarantee.[14]

Defendants argue, however, that the fee-waiver policy for needy students satisfies the requirements of the free school guarantee. They suggest that the right "to be educated at the public expense" (*Ward* v. *Flood, supra,* 48 Cal. at p. 51) amounts merely to a right *not to be financially prevented* from enjoying educational opportunities. This argument contradicts the plain language of the Constitution.

In guaranteeing "free" public schools, article IX, section 5 fixes the precise extent of the financial burden which may be imposed on the right to an education—none. (See *Granger et al.* v. *Cascade Co. Sch. Dist., supra,* 159 Mont. at pp. 528-529; *Bond* v. *Ann Arbor School District, supra,* 383 Mich. at p. 700.)[15] A school which conditions a student's participation in educational activities upon the payment of a fee clearly is *not* a "free school."

The free school guarantee reflects the people's judgment that a child's public education is too important to be left to the budgetary circumstances and decisions of individual families. It makes no distinction between needy and nonneedy families. Individual families, needy or not, may value education more or less depending upon conflicting budget priorities. As John Swett, the "father of the California public school system," recognized in

---

[14]Educational activities are to be distinguished from activities which are purely recreational in character. Examples of the latter might include attending weekend dances or athletic events.

[15]In the words of one delegate to the constitutional convention: "A free school is a school at which pupils may attend *without charge* . . . ." (Proceedings, *supra,* at p. 1100 [remarks of L. F. Jones], italics added.)

1863, "[i]f left to their own unaided efforts, a great majority of the people will fail through want of means to properly educate their children; *another class, with means at command, will fail through want of interest.* The people then, can be educated only by a system of Free Schools, supported by taxation, and controlled directly by the people." (Swett, *Duties of the State to Public Schools,* reprinted in Swett, History of the Public School System of California (1876) p. 110, italics added.)

The free school guarantee lifts budgetary decisions concerning public education out of the individual family setting and requires that such decisions be made by the community as a whole. Once the community has decided that a particular educational program is important enough to be offered by its public schools, a student's participation in that program cannot be made to depend upon his or her family's decision whether to pay a fee or buy a toaster.

Nor may a student's participation be conditioned upon application for a special waiver. The stigma that results from recording some students as needy was recognized early in the struggle for free schools. Thaddeus Stevens once declared, in response to an 1835 proposal that teachers keep a list of "poor scholars": "Sir, hereditary distinctions of rank are sufficiently odious; but that which is founded on poverty is infinitely more so. Such a law should be entitled 'an act for branding and marking the poor, so that they may be known from the rich and proud.'" (Stevens, *A Plea for Free Schools,* in Educational Ideas in America: A Documentary History, *supra,* at p. 188.) Defendants' extracurricular programs are not truly "free" even to those students who are eligible for waivers. "[T]o a child or his parents financially unable to pay the additional fees and charges imposed by a *free, public school system* any waiver procedure is a degrading experience." (*Granger et al.* v. *Cascade Co. Sch. Dist., supra,* 159 Mont. at p. 529 [holding that a waiver plan cannot render a school fee constitutional].)

Finally, defendants warn that, if the fees are invalidated, many school districts may be forced to drop some extracurricular activities. They argue that invalidation would—in the name of the free school guarantee—produce the anomalous result of reducing the number of educational opportunities available to students.

This court recognizes that, due to legal limitations on taxation and spending (see *ante,* fn. 1), school districts do indeed operate under difficult financial constraints. However, financial hardship is no defense to a violation of the free school guarantee. In *Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664 [226 P. 926], for example, this court applied the free school guarantee to invalidate a school district's policy of excluding Native American

children from the public schools. The school district protested that the infusion of Indian children would overstrain local finances. In rejecting that argument, this court noted: "The economic question is no doubt an important matter to the district, but it may very properly be addressed to the legislative department of the state government." (*Id.*, at p. 674.)

Perhaps, in the view of some, public education could be more efficiently financed by peddling it on the open market. Under the California Constitution, however, access to public education is a right enjoyed by all—not a commodity for sale. Educational opportunities must be provided to all students without regard to their families' ability or willingness to pay fees or request special waivers. This fundamental feature of public education is not contingent upon the inevitably fluctuating financial health of local school districts. A solution to those financial difficulties must be found elsewhere— for example, through the political process.

In conclusion, this court holds that the imposition of fees for educational activities offered by public high school districts violates the free school guarantee. The constitutional defect in such fees can neither be corrected by providing waivers to indigent students, nor justified by pleading financial hardship.

## III.

Plaintiffs also argue that the fee requirement violates title 5, section 350 of the California Administrative Code (hereafter, title 5, section 350). That section provides: "A pupil enrolled in a school shall not be required to pay *any* fee, deposit, or other charge not specifically authorized by law." (Italics added.)

Both the plain language of the regulation and the constructions supplied by the Legislative Counsel and the Department of Education indicate that title 5, section 350 bars school districts from charging fees for educational extracurricular activities.[16] The Legislative Counsel has interpreted title 5, section 350 to bar fees for school-sponsored extracurricular activities such as school athletics and drama activities. (Ops.Cal.Legis. Counsel, No. 18293 (Oct. 13, 1982) School Fees: Extracurricular Activities.) In reaching this conclusion, the Legislative Counsel explained that although a governing board may not be required to provide extracurricular programs, "once the programs are provided, the governing board has no authority to impose a

---

[16]Since no noneducational programs are involved in this case (see *ante*, fn. 14), this court need not decide whether title 5, section 350's prohibition on fees extends beyond educational activities.

fee, charge or deposit for the programs." (*Id.,* at p. 4; see also Ops.Cal.Legis. Counsel, No. 17036 (Nov. 16, 1979) School Fees, pp. 1-5 [title 5, section 350 prohibits fees for musical instruments used in extracurricular band, special uniforms used in extracurricular activities, club dues, and extracurricular athletic teams].)

Similarly, the Department of Education has taken the position that title 5, section 350 prohibits membership fees as a condition of participation in "athletic or other activities" sponsored by a school. (Cal. Dept. of Ed., Fees, Deposits, and Charges in the Public Schools of California, Grades K-12 and Adult Schools (1979) pp. 1-2.) ■ The construction given to a regulation by the officials charged with its enforcement is entitled to great weight. (*Westfall* v. *Swoap* (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750]; *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262, 271 [125 Cal.Rptr. 864].)

■ ■ Defendants counter with two arguments. First, they contend that title 5, section 350, if interpreted to bar the defendants' fee program, would exceed its constitutional and statutory bases of authority.

The state Board of Education (State Board) promulgated title 5, section 350 over 40 years ago pursuant to its statutory duty to "adopt rules and regulations not inconsistent with the laws of this state . . . for the government of the . . . day and evening secondary schools." (Former Pol. Code, § 1519, now Ed. Code, § 33031.[17]) A note appended to title 5, section 350 cites article IX, section 5 of the Constitution (the "free school" guarantee) as its specific basis of authority.

■ In determining whether a specific administrative rule falls within the coverage of a delegated power, "the sole function of this court is to decide whether the department reasonably interpreted the legislative mandate." (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176 [70 Cal.Rptr. 407, 444 P.2d 79]; see also *Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697]; *Credit Ins. Cen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].)

■ Regulations concerning school fee policies clearly fall well within the scope of the delegated power to adopt regulations "for the government . . . of the day and evening secondary schools." (§ 33031.) Hence, the only question is whether a ban on fees for noncredit activities represents a "reasonable interpretation" of a constitutional or legislative mandate. ■ This court's holding that the constitutional "free school" guarantee (Cal.

---

[17]Unless otherwise noted, all statutory references are to the Education Code.

Const., art. IX, § 5) prohibits the fees (*ante,* at p. 913) obviously nullifies any contention that section 350's prohibition against fees for educational extracurricular activities is not mandated by law. ■ However, even if article IX, section 5 is assumed not to bar the fees, it is clear that title 5, section 350's ban on fees falls well within the State Board's range of discretion.

To hold, as defendants urge, that administrative prohibitions are valid only when statutory or constitutional provisions independently prohibit the activities at issue would be to eliminate any role for administrative discretion. Here, the State Board—pursuant to its "general power" to adopt rules for the government of school districts (*San Francisco* v. *Hyatt* (1912) 163 Cal. 346, 352 [125 P. 751])—has determined that the broad constitutional and legislative policy[18] in favor of free schools requires a prohibition on fees for extracurricular activities. No statute or constitutional provision suggests that the State Board is compelled to adopt a narrow, credit-centered view of education. Rather, the precise relation of noncredit activities to the policy in favor of free public education has properly been left to the expert judgment of the State Board.

■ Second, defendants suggest that Education Code section 35160,[19] the "permissive code section," effectively nullifies title 5, section 350. Prior to the effective date of section 35160, local school districts possessed little, if any, power to act without express legislative or administrative authorization. (See *City of Oakland* v. *Oakland etc. Sch. Dist.* (1956) 138 Cal.App.2d 406, 409 [291 P.2d 1001].) Section 35160 provides local districts with more flexibility. Defendants contend that their fee program represents a proper exercise of the discretion granted to school districts by that section.

However, the flexibility provided by section 35160 is not without limits. School districts are authorized only to "initiate and carry on any program, activity, or . . . otherwise act in any manner *which is not in conflict with . . . any law . . . .*" (Italics added.)

---

[18]This policy is reflected not only in the constitutional free school guarantee, but also in article XVI, section 8, of the Constitution, which states that "[f]rom all state revenues there shall *first* be set apart the monies to be applied by the state for support of the public school system and public institutions of higher education." (Italics added.) It is also apparent in numerous statutory provisions, among them section 37105 (high school districts prohibited from charging tuition) and section 60070 (school officials prohibited from requiring any pupil to purchase instructional materials).

[19]Section 35160 states in full: "On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established."

 The District's fee program is in clear conflict with title 5, section 350. (See *ante,* at pp. 913-914.) Nevertheless, defendants argue that the program is authorized because title 5, section 350 is only an administrative regulation, not a "law" within the meaning of section 35160.

Under defendants' construction, section 35160 would work a radical change in the relationship between local school districts and the State Board. If valid administrative regulations were not "laws" under section 35160, the section would authorize local school districts to act in derogation of all regulations promulgated by the State Board. Such a construction of section 35160 would effectively repeal not only section 33031, which directs the State Board to adopt regulations for the government of the secondary schools, but also section 35014, which commands district boards to "prescribe and enforce rules not inconsistent with . . . the rules prescribed by the State Board of Education . . . ."

This far-reaching result is not supported either by the legislative history or by subsequent interpretations of section 35160. In 1972, California voters approved a constitutional amendment authorizing the Legislature to permit school districts "to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established." (Cal. Const., art. IX, § 14.) In the voters' pamphlet which accompanied the initiative, the Legislative Counsel explained that the provision would enable the Legislature to relieve itself of the necessity of granting specific authorization for every activity carried out by local school districts. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 14.) Neither the proposed amendment nor the Legislative Counsel's analysis said anything about repealing existing regulations. (*Id.,* at p. 14 & appen. p. 6.)[20]

Section 35160, enacted by the Legislature in 1976, embodies language substantially similar to that of the initiative. (See *ante,* fn. 19.) Like the initiative, it evidences neither an intent to repeal existing regulations nor an intent to deprive the State Board of its power to promulgate binding regulations. On the contrary, it appears that the Legislature intended that validly enacted regulations would remain in effect.

This conclusion accords with the position taken by the Legislative Counsel and the Department of Education. The Legislative Counsel has advised that

---

[20]After restating the text of the proposed initiative, the Legislative Counsel concluded: "Thus, the Legislature would not have to grant specific authority for a school board to carry out a particular activity, but could authorize school boards to carry out any activity if it is related to school purposes and is not prohibited by law." (Ballot Pamp., *supra,* at p. 14.)

title 5, section 350 operates to prohibit fees for extracurricular activities notwithstanding section 35160. (Ops.Cal.Legis. Counsel, No. 18293 (Oct. 13, 1982) School Fees: Extracurricular Activities, pp. 3-4; Ops.Cal.Legis. Counsel, No. 17036 (Nov. 16, 1979) School Fees, p. 3; cf. Ops.Cal.Legis. Counsel, No. 17529 (undated) School Fees, p. 3.) Similarly, the Department of Education has expressed its opinion that "[title 5, s]ection 350 is a 'law'" and thus is not superseded by section 35160. (Cal. Dept. of Ed., Fees, Deposits, and Charges in the Public Schools of California, Grades K-12 and Adult Schools (1979) p. 6.)

■ In short, title 5, section 350 represents a valid exercise of the general regulatory authority delegated to the State Board under section 33031. ■ The enactment of the permissive code section (§ 35160) did nothing to diminish this authority. ■ In accordance with the plain language of title 5, section 350 and the constructions given it by the Legislative Counsel and the California Department of Education, this court concludes that defendants' fee program is prohibited by title 5, section 350.

### IV.

■ ■ In conclusion, the imposition of fees as a precondition for participation in educational programs offered by public high schools on a noncredit basis violates the free school guarantee of the California Constitution and the prohibition against school fees contained in title 5, section 350 of the California Administrative Code.[21]

The judgment is reversed.

Broussard, J., and Reynoso, J., concurred.

MOSK, J.—I concur in the judgment and in most of the analysis of the majority opinion. However, there are certain limitations implicit in the rationale to which I cannot wholly subscribe.

Despite the sugar-coating of inspirational quotations from Jefferson, Emerson, John Swett, Thaddeus Stevens and Horace Mann, the repeated emphasis of the majority opinion is on pragmatism, i.e., the demonstrable benefit that education produces for the body politic and "for active involvement in political affairs" (maj. opn. at p. 907). The majority declare, "Education stimulates interest in the political process and provides the intellec-

---

[21]In view of the disposition of these issues, this court does not reach plaintiffs' additional arguments that the fee policy violates the equal protection guarantee of the California Constitution and that it is preempted by state law.

tual and practical tools necessary for political action" (*ibid.*) and influences "political participation and awareness" (*ibid.*). It makes possible "'an enlightened and effective public opinion'" (maj. opn. at p. 908). It enables one "to evaluate independently the pronouncements of pundits and political leaders" (*ibid.*). It prepares individuals to participate in labor unions and business enterprises (*ibid.*). It is the bright hope of the "poor and oppressed" to participate in economic life (maj. opn. at p. 908). It brings "together members of different racial and cultural groups" (*ibid.*). It is a "'unifying social force'" (maj. opn. at p. 908) and develops "skills useful in political activity" (maj. opn. at p. 908). It also has value in preparing for the exercise of "economic power" (*ibid.*).

The foregoing recitation of assets may be useful in preparing an economic or political balance sheet. However, in my view education is inherently beneficial to the individual, without regard to its contribution, if any, to his or society's economic, social or political well-being. The latter is a potential tangential benefit, but not an essential ingredient in confirming the value of an education.

The framers of the California Constitution in 1849 demonstrated an appreciation of the inherent value of an education. They provided in the original article IX, section 2, that "The legislature shall encourage, by all suitable means, the promotion of intellectual . . . improvement."

The person who reads Homer, Shakespeare, Byron, Joyce, and Yeats, studies music, dance and drama, learns to appreciate art and architecture, or contemplates the wonders of nature and the universe, may never achieve economic, social or political advantage, or contribute tangibly to society. But his cultural attainments will produce the inner rewards and self-gratification of a well-rounded human being that in and of themselves justify public education. As Justice Story wrote: "It is one of the wise dispensations of Providence that knowledge should not only confer power, but should also confer happiness." (Story, Miscellaneous Writings 124.)

Montaigne, in his classic essay on the Education of Children, declared that each person should "be taught to know what it is to know, and what to be ignorant; what ought to be the end and design of study; what valor, temperance and justice are; the difference between ambition and avarice, servitude and subjection, license and liberty; by what token a man may know true and solid contentment; how far death, afflication and disgrace are to be apprehended; by what secret springs we move, and the reason of our various agitations and irresolutions; for, methinks, the first doctrine with which one should season his understanding ought to be that which regulates his manners and his sense, that teaches him to know himself, and how both

well to die and well to live." (Montaigne, Selected Essays (U. of Chi. Great Books ed.) p. 84.)

With the qualification of my belief that education is its own reward, without dependence upon any supplemental societal virtues, I join in the conclusion that all aspects of public education are and must remain free.

**GRODIN, J.—** I concur in the conclusion of the Chief Justice that the fees here in issue are impermissible.

I agree that the values implicit in the constitutional "free school" guarantee extend beyond the mere acquisition of credit and embrace the more fundamental benefits of education, both social and individual, so eloquently described in the opinions of the Chief Justice and Justice Mosk. I agree also that the charges sought to be imposed by the Santa Barbara High School District in this case, well motivated as they undoubtedly are, constitute a breach of that basic compact.[1]

As Justice Kaus observes in his concurring opinion it is difficult for this court to anticipate the variety of contexts in which the validity of school-related fees may be questioned, and for that reason I think it wise to proceed with caution. Here, the District seeks to impose fees for the privilege of participating in activities which occur on school property, under the instructional supervision of school personnel, and which not only provide "important educational experiences," as the District concedes, but are functionally and intimately related to the District's established curriculum. A child interested in drama is told, in effect, "you may attend the drama class, study about plays, and participate in rehearsals, but when it comes to the actual performance you must remain backstage unless you pay a fee."[2] I have no hesitation in saying that such an artificial bifurcation of the educational experience is incompatible with the constitutional mandate.

**KAUS, J.—**I concur in the judgment. Under Education Code section 35014,[1] a local school district may only adopt rules which are "not inconsistent with law or with the rules prescribed by the State Board of Education." The local fees for extracurricular activities at issue here conflict with an administrative regulation—title 5, section 350 of the California

---

[1]While title 5, section 350 of the California Administrative Code arguably provides a nonconstitutional basis for arriving at the same result, that regulation was itself adopted on the authority of the constitutional "free school" guarantee. The validity of the regulation is thus linked to interpretation of the constitutional provision.

[2]It is unclear from the record, but I would assume that a student who is to remain backstage during a production will not have opportunity to play major roles during rehearsals.

[1]Hereafter, section references are to the Education Code.

Administrative Code—prescribed by the State Board of Education. (See Cal. Dept. of Ed., Fees, Deposits and Charges in the Public Schools of California, Grades K-12 and Adult Schools (1979); Ops.Cal.Legis. Counsel, No. 18293 (Oct. 19, 1982) School Fees: Extracurricular Activities; Ops.Cal.Legis. Counsel, No. 17036 (Nov. 16, 1979) School Fees.) **(5e), (2f)** Because I believe that—under familiar standards (see, e.g., *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176 [70 Cal.Rptr. 407, 444 P.2d 79]; *Credit Ins. Cen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993])—the state board had authority to promulgate the regulation in question (see § 33031; *City and County of San Francisco* v. *Hyatt* (1912) 163 Cal. 346, 352-354 [125 P. 751]), I agree with the lead opinion that the challenged fees cannot stand. In view of this conclusion, there is no need to reach the broad constitutional question discussed in part II of the lead opinion.

Furthermore, in this case there are weighty reasons for not embarking on the constitutional journey which the lead opinion undertakes. For judges, the "free school" guarantee is a rarely traveled route; we have few, if any, helpful precedential guides in the California cases. In this unmapped setting, it is difficult to predict the practical effect that a broad constitutional pronouncement may have in a great variety of situations. Well-intentioned judicial efforts to provide sweeping, "absolute" rules to protect the values underlying the "free school" provision may well prove, in practice, to have precisely the opposite effect by foreclosing reasonable legislative options.

If I understand the lead opinion correctly, it concludes that all "educational" activities offered by public schools—whether credit-bearing or extracurricular, whether taking place during the school day, before or after school hours—must, as a matter of constitutional mandate, be provided absolutely "free."[2] Although the lead opinion does not purport to pass on the matter, its proposed rule would apparently invalidate a number of statutory provisions which authorize the charging of fees in a variety of special settings. For example, section 35330 implicitly permits a school district to impose a charge for field trips or excursions, while at the same time specifying that no pupil shall be prevented from making the trip because of a lack of funds. (Cal. Dept. of Ed., Fees, Deposits, and Charges in the Public Schools of California, Grades K-12 and Adult Schools (1979) pp. 2-3.) Similarly, sections 32220 to 32224—after requiring districts to provide medical and accident insurance for each member of an athletic team—authorize a district to pass such cost on to the parents of each member who can afford to pay. And section 48909 permits a district to charge a parent when a pupil

---

[2] The lead opinion would acknowledge that fees may be charged for "recreational," as distinguished from "educational," activities. (*Ante,* p. 911, fn. 14.)

loses a loaned book. (See also §§ 39804 [permitting charges for transportation costs under certain circumstances]; 35335 [permitting charges for school camp programs].)

My point is not that all of these statutory provisions are necessarily valid, but simply that their existence points up the potential complexity of the school fee issue and the importance of considering the particular setting in which the fee is imposed. The Legislature and educational administrators have been involved with these issues for some years, and I believe that we would do well to proceed cautiously and limit ourselves to the question before us.

Since, as noted at the outset, there is a valid administrative regulation which clearly prohibits the local fees at issue, we should avoid a premature resolution of the constitutional mandate.

**BIRD, C. J.**—It may come as a surprise to the reader, but I concur fully in my opinion for the court. I write separately to advance an additional argument in support of the holding. In my view the District's fee program violates the equal protection guarantee of the California Constitution.[1]

This court strictly scrutinizes governmental classifications that touch upon fundamental interests or involve suspect classifications. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 768 [135 Cal.Rptr. 345, 557 P.2d 929] [hereafter, *Serrano II*], cert. den. *sub nom., Clowes, Superintendent of Schools of Los Angeles County, et al.* v. *Serrano et al.* (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951].) Under this standard, the governmental entity "bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 785 [87 Cal.Rptr. 839, 471 P.2d 487], cert. den. (1971) 403 U.S. 922 [29 L.Ed.2d 700, 91 S.Ct. 2225]; see also *In re Antazo* (1970) 3 Cal.3d 100, 111 [89 Cal.Rptr. 255, 473 P.2d 999].)

Plaintiffs argue that the District's fee program: (1) touches upon a fundamental interest—education; and (2) classifies on the basis of a suspect classification—wealth. For the reasons stated below, I agree and, applying

---

[1]This guarantee is contained in three separate provisions. Article I, section 7, subdivision (a) provides in part: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ." Article I, section 7, subdivision (b) states in part: "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens." Article IV, section 16, subdivision (a) provides: "All laws of a general nature have uniform operation."

strict judicial scrutiny, conclude that the fees are not necessary to the achievement of a compelling governmental interest.

It is well established that education constitutes a fundamental interest under the California Constitution. (*Serrano II, supra,* 18 Cal.3d at pp. 765-766; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 608-609 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] [hereafter, *Serrano I*].) At issue in this case is whether noncredit, after-school educational activities are encompassed within this concept.

Defendants argue that the fundamental right to an "education" guarantees nothing more than an opportunity to progress from grade to grade and receive a diploma. Under this view, a classification affecting programs that do not carry credit toward grade progression or graduation does not touch upon a fundamental interest regardless of the programs' actual educational value.

However, the *Serrano* concept of education as a fundamental interest is not defined by the whims of scheduling or by the formalities of credit, grading, or diplomas. In *Serrano I,* this court recognized education as a fundamental interest not because of its role in conferring credentials, but because of its extensive and indispensable benefits—to society as well as to individual children—in imparting information, training, and social experience. (*Serrano I, supra,* 5 Cal.3d at pp. 606-610; see also maj. opn., *ante,* at pp. 907-908.) The harms inherent in unequal education result not merely from inequalities in the distribution of credentials, but also from disparate training, experience, and knowledge. The contrary view cannot account for this court's recognition that " '[u]nequal education . . . leads to . . . handicapped *ability* to participate in the social, cultural, and political activity of our society.' " (*Serrano I, supra,* at p. 606, citing *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 950 [92 Cal.Rptr. 309, 479 P.2d 669], cert. den. *sub nom., Fehlhaber et al.* v. *San Francisco Unified School Dist. et al.,* 401 U.S. 1012 [28 L.Ed.2d 549, 91 S.Ct. 1266], italics added.)

As the majority explain, educational extracurricular activities play an integral role in imparting the many benefits of education. (See maj. opn., *ante,* at pp. 909-911.) The value of educational activities in promoting the political, economic, and social functions of education is not contingent upon the granting of academic credit.[2] Indeed, it is widely recognized that athletic

---

[2]This point has been well expressed by educational theorists: "Wrestling with the problems of democratic government as they are met in the student council or the homeroom is as much a part of the curriculum as study in the classroom about the form of government of ancient Rome or modern Detroit. In fact, it may be much more significant, for the latter

competition and other group activities, including those offered on a noncredit basis, are particularly suited to the development of leadership qualities and citizenship. (See, e.g., *McGrath* v. *Burkhard* (1955) 131 Cal.App.2d 367, 376 [280 P.2d 864]; *Alexander* v. *Phillips* (1927) 31 Ariz. 503 [254 P. 1056, 1059, 52 A.L.R. 244]; *Parrish* v. *Moss* (1951) 200 Misc. 375 [106 N.Y.S.2d 577, 584], affd. 279 App.Div. 608 [107 N.Y.S.2d 580].)

Nor does formal credit determine the value of educational activities in promoting economic democracy. It requires no leap of logic to recognize that students with performance experience will be better prepared for future employment. (Cf. *Cabrillo Community College Dist.* v. *California Junior College Assn.* (1975) 44 Cal.App.3d 367, 373 [118 Cal.Rptr. 708].) Moreover, the leadership qualities and cooperative spirit developed in group activities are useful not only for political activities narrowly defined, but also for participation in labor unions and business enterprises, the institutions that exercise power in the "private" economic sphere. In the words of John Dewey, "[i]t is not enough to see to it that education is not actively used as an instrument to make easier the exploitation of one class by another. School facilities must be secured of such amplitude and efficiency as will in fact and not simply in name discount the effects of economic inequalities, and secure to all the wards of the nation equality of equipment for their future careers." (Dewey, Democracy and Education (1957) p. 114.)

Finally, the performances and competitions affected by the fee program require teamwork and cooperation.[3] In that respect, they contribute directly to the function of education as a "unifying social force" (*Serrano I, supra,* 5 Cal.3d at p. 608) regardless of whether or not they are offered for credit.

In short, educational extracurricular activities—like their credit-generating counterparts—promote the constitutionally recognized purposes of public education. Accordingly, they are encompassed within the concept of education as a fundamental interest.

In *Serrano I,* this court held that classifications based upon wealth are suspect—at least when they touch upon fundamental interests such as edu-

in the hands of an unimaginative teacher may remain merely facts-to-be-learned and represent in no real sense an experience of the pupil. Planning an assembly program, . . . reporting student activities for the school paper, participation on an athletic team—all represent pupil experience in a learning situation and consequently comprise a definite part of the curriculum." (Johnston & Faunce, Student Activities in Secondary Schools (1952) p. 7.)

[3]For example, the director of vocal music at Dos Pueblos High School testified at trial that "the group is the important thing, the bringing together of many individuals in a single group [and] making it a performing unit." In class, students learn to sing together; at the performances they realize that they have accomplished something, and "are able to share that experience in a group situation with each other and [with the teacher] and with an audience."

cation. (5 Cal.3d at pp. 597-610; see also *Serrano II, supra,* 18 Cal.3d at pp. 765-766.) Wealth classifications introduce a capricious and arbitrary factor into the distribution of educational services. Moreover, to the extent that such classifications further disadvantage economically needy students or further advantage wealthy students, they have a pernicious effect on the constitutionally recognized role of education in preparing *all* members of society for effective participation in the political, economic, and social "mainstream of American Society" (*Serrano I, supra,* 5 Cal.3d at p. 609). Further, to permit wealth-based inequalities in public education—one of few institutions with the potential to bring rich and poor together on a nonhierarchical basis—would be to disrupt the role of education in promoting social cohesion.

A fee uniformly imposed as a precondition for the exercise of a fundamental right directly classifies on the basis of wealth. (*Harper* v. *Virginia State Bd. of Elections* (1966) 383 U.S. 663, 666-668 [16 L.Ed.2d 169, 172-173, 86 S.Ct. 1079] [flat fee, imposed as a precondition of voting, classifies on the basis of wealth]; *Griffin* v. *Illinois* (1956) 351 U.S. 12, 16-18 [100 L.Ed. 891, 897-898, 76 S.Ct. 585, 55 A.L.R.2d 1055] [requirement that all noncapital criminal defendants pay for their own transcript on appeal discriminates on the basis of wealth]; *Tate* v. *Short* (1971) 401 U.S. 395, 397-399 [28 L.Ed.2d 130, 132-133, 91 S.Ct. 668] [requirement that all criminal defendants convicted of specified offenses pay a fine as a condition of avoiding imprisonment classifies on the basis of wealth]; *In re Antazo, supra,* 3 Cal.3d 100, 112 [same]; see also *Williams* v. *Illinois* (1970) 399 U.S. 235 [26 L.Ed.2d 586, 90 S.Ct. 2018]; *Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814].)

Defendants' program imposes a fee as a precondition for students' participation in activities integral to their fundamental interest in education. To some families, the fees represent a significant expenditure (see *post,* fn. 4); to others, they are minimal. Hence, it is apparent that the fee program imposes disparate burdens on students according to their families' wealth.

Defendants contend that their fee-waiver program corrects any constitutional deficiency in the fee requirement. They argue that because an indigent student may obtain a "scholarship" to participate without paying a fee, the fee program does not impose any serious burden on a group defined by wealth. As evidence for this proposition, they point to the fact that the record gives no indication that any student was prevented from participating in the noncredit activities. Hence, they conclude, there was no invidious discrimination.

However, as defendants concede, the waiver is available only to those students who meet a specified standard of need. (See maj. opn., *ante,* p. 904,

fn. 4, and accompanying text.) And—at least where education is concerned—the protection afforded by the equal protection guarantee does not stop at the poverty line. It also addresses inequalities within the category of "nonneedy" families.[4] This conclusion flows from an analysis of cases involving wealth classifications affecting fundamental interests. These cases fall into two groups—one involving the rights of defendants in criminal cases, and the other involving the right to vote.

It is true that in cases concerning the rights of criminal defendants, wealth classifications have been invalidated only to the extent that they affect indigent litigants. (See, e.g., *Tate* v. *Short, supra,* 401 U.S. at pp. 400-401 [28 L.Ed.2d at p. 134]; *Williams* v. *Illinois, supra,* 399 U.S. at pp. 243-244 [26 L.Ed.2d at p. 594]; *Douglas* v. *California, supra,* 372 U.S. at p. 355 [9 L.Ed.2d at p. 813]; *Griffin* v. *Illinois, supra,* 351 U.S. at p. 16 [100 L.Ed. at p. 897]; *In re Antazo, supra,* 3 Cal.3d at pp. 113-115.) In these cases, the equal protection analysis is substantially identical to the analysis applied where the constitutional right of due process is at issue: the focus is on the *absolute* deprivation of a right, not upon *relative* disparities in individuals' access to a right. (Cf. *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 382 [28 L.Ed.2d 113, 121, 91 S.Ct. 780] [fee, imposed upon indigent spouses as a precondition for obtaining a divorce violates due process clause].)

However, where the right to vote is concerned, wealth classifications are invalid whether or not anyone has actually been prevented from voting. In *Harper* v. *Virginia Bd. of Elections, supra,* 383 U.S. 663, the court struck down a $1.50 poll tax and declared: "We say the same whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it. The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote *or who fail to pay.*" (*Id.,* at p. 668 [16 L.Ed.2d at p. 173], italics added.)

The *Serrano* decisions leave no doubt as to which approach should be applied here: "The analogy between education and voting is much more

---

[4]It is apparent that financial constraints short of "inability to pay" may substantially influence a family's decision whether to pay the fee. The record shows that at least four students applied for fee waivers, but did not meet the need criteria. These students were enabled to participate only because the assistant superintendent exercised his discretion to waive the payment deadline. In Modesto High School Band and Orchestra Booster Club, Inc. et al. v. Modesto High School District et al. (Dec. 28, 1982) (Super. Ct. Stanislaus Co., No. 178769) (unpub. opn.), brought to this court's attention by both plaintiffs and defendants, two students were prevented from participating in extracurricular activities by a $30 fee. Neither student qualified for the Modesto district's waiver plan, which applied to all students whose families were recipients of AFDC benefits.

direct: both are crucial to participation in, and the functioning of, a democracy." (*Serrano I, supra,* 5 Cal.3d at p. 607.)[5] Whereas the indigent criminal defendant cases are concerned with the effective *denial* of a fundamental right due to an inability to pay, *Harper* and the *Serrano* decisions are concerned with inequalities affecting the *relative ability* of individuals to exercise their fundamental rights. Both *Serrano I* and *Serrano II* rejected arguments that assistance to poverty-stricken districts, short of complete equalization of funding sources, could remedy the constitutional defect. (5 Cal.3d at p. 598; 18 Cal.3d at pp. 754-755.)

In *Serrano I,* defendants raised an argument analogous to that raised by defendants in this case. They suggested that there was no infirmity in a school funding scheme based on district property wealth so long as all districts could, by varying their tax rates, achieve the same level of spending per pupil. This court rejected that argument, reasoning that "obviously, the richer district is favored when it can provide the *same* educational quality for its children with less tax effort." (5 Cal.3d at p. 599, italics added.) Here, the fee program obviously favors richer families since they can obtain the same access to educational programs with less financial effort. Conversely, poorer families bear a greater burden whether they "pay[] the fee or fail[] to pay it." (*Harper* v. *Virginia Bd. of Elections, supra,* 383 U.S. at p. 668 [16 L.Ed.2d at p. 173].)

For all of these reasons, wealth classifications affecting educational programs—whether denominated "curricular" or "extracurricular," and whether or not accompanied by fee-waiver programs—are subject to strict scrutiny under the equal protection guarantee of the California Constitution.

It remains to be determined whether the fee program is "necessary to achieve a compelling state interest." (*Serrano II, supra,* 18 Cal.3d at p. 768.)

Defendants claim that the fee policy is necessary to finance the performance programs. They argue that abolition of the fees would deprive *all* students of these "important educational experiences." Therefore, they conclude, the fees are necessary to achieve the district's educational purposes.

This court has recognized that, as a general matter, "[p]reservation of the fisc is an insufficient justification" under heightened scrutiny. (*Darces* v.

---

[5]In *Serrano I,* this court also noted that "[a]lthough an individual's interest in his freedom is unique, we think that from a larger perspective, education may have far greater social significance than a free transcript or a court-appointed lawyer. . . . '[E]ducation . . . supports each and every . . . value of a democratic society—participation, communication, and social mobility, to name but a few.'" (5 Cal.3d at p. 607.)

*Woods* (1984) *ante,* page 894 [201 Cal.Rptr. 807, 679 P.2d 458].) This observation applies with particular force to classifications affecting education.

Defendants' argument misconstrues the nature of education as a fundamental interest. The analogy to voting is instructive on this point. The value of the right to vote hinges upon rigorous equality among voters. (See *Reynolds* v. *Sims* (1964) 377 U.S. 533, 562-564 [12 L.Ed.2d 506, 527-529, 84 S.Ct. 1362].) Hence, a state interest in some general benefit, such as financing, cannot justify the disparate imposition of burdens on voters according to their wealth, an invidious basis of classification. (See *Harper* v. *Virginia Bd. of Elections, supra,* 383 U.S. at p. 668 [16 L.Ed.2d at p. 173] ["the interest of the State, when it comes to voting, is limited to the power to fix qualifications."].)

The constitutional value of education, like that of voting, depends upon rigorous equality. Inequalities in education produce " 'unequal job opportunities, disparate income, and handicapped ability to participate in the social, cultural, and political activity of our society.' " (*Serrano I, supra,* 5 Cal.3d at p. 606.) Accordingly, "the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis." (*Ibid.,* citing *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 880 [31 Cal.Rptr. 606, 382 P.2d 878].)

In view of the integral importance of equality to education, defendants' asserted interest in maintaining extracurricular programs rests upon a logically unsound foundation. The District claims that, by imposing fees, it is preserving educational opportunities. However, the fee requirement introduces serious inequalities into the affected programs, thus damaging their usefulness in performing the constitutionally mandated functions of education. (See *ante,* at pp. 902-904.) In short, the District seeks to save educational opportunities by undermining their constitutional value.

In *Serrano II,* this court struck down a school financing plan partly because it permitted wealthy districts to override restrictive revenue limits, thus permitting them to gain an advantage over poorer districts. (18 Cal.3d at pp. 768-769.) This reasoning implicitly rejected the notion that the maintenance of high quality education for some can justify the introduction of inequalities in the financing scheme. Applying that principle here, it is clear that the maintenance of extracurricular programs cannot be bought at the cost of introducing wealth-based inequalities among students.

Admittedly, the District is operating within a difficult structure of legal constraints. The electorate has voted to reduce taxation and expenditures, thus making it hard for local districts to maintain their accustomed levels

of educational offerings. But local districts cannot alleviate the effects of taxation and expenditure limits by introducing constitutionally impermissible inequalities into public education. If the voters want higher quality education they must find a solution through the political process, either by employing the remaining permissible methods for raising revenues, or by relaxing the system of constraints.

In conclusion, I would hold that defendants' fee program violates the equal protection guarantee of the California Constitution as well as the constitutional free school guarantee and title 5, section 350 of the Administrative Code.

**RICHARDSON, J.**\*—I respectfully dissent. In my view, a local school district properly may charge a fee for optional participation by high school students in extracurricular activities.

Article IX, section 5 of the California Constitution directs: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." In clarification, section 6 of that article provides in part: "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them."

As early as 1874 we interpreted article IX, section 5, to guarantee to children in this state the right to be educated at public expense. (See *Ward* v. *Flood* (1874) 48 Cal. 36, 50.) Yet there appears to be no decisional or other law which purports to prescribe definitively the content of the educational program which must be provided by the state under this constitutional mandate of a "free school." Indeed, there is little recent law in this area at all. In *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], however, in expressly rejecting the contention that article IX, section 5, applied to school financing, we cited with approval our earlier constructions of the provisions: "We have held that the word 'system,' as used in article IX, section 5, implies a 'unity of purpose as well as an entirety of operation, and the direction to the legislature to provide "a" system of common schools means *one* system which shall be applicable to all the common schools within the state.' (*Kennedy* v. *Miller* (1893) 97 Cal. 429, 432 . . . .) However, we have never interpreted the

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

constitutional provision to require equal school spending; we have ruled only that *the educational system must be uniform in terms of the prescribed course of study and educational progression from grade to grade. (Piper v. Big Pine School Dist.* (1924) 193 Cal. 664, 669, 673 . . . .)'' (5 Cal.3d at pp. 595-596, second italics added.)

Although that discussion was tangential to the primary, financing issue in *Serrano,* it was central to the holding in *Piper.* In the latter case, we issued a writ of mandamus compelling a local school district to admit to its school a 15-year-old American Indian who had been excluded therefrom. (193 Cal. at p. 674.) Our ruling was based on the mandate of article IX, section 5, and on state statutes adopted in implementation thereof. (*Id.,* at pp. 668-669.) In attempting to define the ''enforceable rights'' embodied in the ''free school'' guarantee, we declared that the provisions required ''a uniform system and course of study'' pursuant to which ''pupils advance progressively from one grade to another and, upon the record made, are admitted from one school into another pursuant to a uniform system of educational progression.'' (*Id.,* at p. 669.) In elaboration, we observed: ''Each grade forms a working unit in a uniform, comprehensive plan of education. Each grade is preparatory to a higher grade, and indeed, affords an entrance into schools of technology, agriculture, normal schools, and the University of California. In other words, the common schools are doorways opening into chambers of science, art, and the learned professions, as well as into fields of industrial and commercial activities. Opportunities for securing employment are often more or less dependent upon the rating which a youth, as a pupil of our public institutions, has received in his school work. These are rights and privileges that cannot be denied.'' (*Id.,* at p. 673.)

In essence, *Piper* construed the constitutional mandate to provide a free school as encompassing ''a uniform system and course of study'' pursuant to which students could progress from grade to grade by satisfying uniform requirements of a prescribed course of study. The goals of the public school system and the hoped-for consequences of participation therein have changed little from that time to this, and I believe that *Piper*'s constitutional interpretation is equally valid today. Accordingly, any attempt to impose a fee or charge upon any student as a condition of his obtaining the benefits of such system would be proscribed. Most clearly within that proscription would be fees charged as a condition of academic progression or of receiving credit toward graduation. The fact that a class, course or activity bears credit towards progression through the free school system which is the gist of the constitutional right would clearly bar any charge therefor.

Neither *Piper* nor any other case of which I am aware, however, has held that article IX, section 5, prohibits the imposition of fees for participation

in extracurricular activities. By definition such activities are not within the prescribed course of study necessary for progression from grade to grade. No credit toward graduation is given for extracurricular activities and no student is required to participate therein in order to progress through the system or to receive credit for related credit-bearing courses in the regular curriculum. Thus, I see no impairment of the constitutional right to attend free schools by an activity fee program, such as the Santa Barbara School District's (District), limited to extracurricular activities.

Apparently, the Legislative Counsel of California has interpreted our law similarly. At *plaintiffs'* request, the trial court took judicial notice of two opinions of that office. In one, the legislative counsel opined that school districts could not charge a fee or require pupils to purchase necessary materials for a "school-sponsored activity." While that activity was not specifically identified in the opinion, the counsel's rationale was more illuminating. The declared ground for the opinion was that there was neither statutory nor regulatory authority "to require pupils to pay a fee in order to participate in a course offered *as part of the regular school program,*" and that title 5, section 350 of the California Administrative Code expressly forbade any charge "not specifically authorized by law." (Ops.Cal.Legis.Counsel, No. 17529 (undated) School Fees, pp. 1-4, italics added.) While that opinion obviously was cited by plaintiffs to further their contention that the fees at issue here are objectionable, the underscored portion of the quotation arguably implies that the prohibition was being applied to courses which were a part of the regular school curriculum and *not* to extracurricular activities.

Of clearer relevance is the other opinion relied upon by plaintiffs. (See Ops.Cal.Legis.Counsel, No. 17036 (Nov. 16, 1979) School Fees.) There the legislative counsel discussed the practice of school districts to charge fees for a variety of materials and activities, including musical instruments for extracurricular band, special uniforms for extracurricular activities, expenses of extracurricular athletic teams, and club dues. Though ultimately concluding that such fees were barred by title 5, section 350 of the California Administrative Code—a conclusion with which I deal below—the legislative counsel nonetheless acknowledged that each of the four items identified above relates to "extracurricular activities outside the regular course requirements . . . . Fees and deposits for [these] items . . ., we think, would *not* be prohibited by Section 5 of Article IX of the California Constitution because they do not concern a regular course of study." (*Id.,* at p. 4, italics added.)

I agree with the latter conclusion. (I note, further, that the disparity between the constitutional provision and the administrative code provision

which induced the legislative counsel to conclude that extracurricular activity fees which were *not* barred by the former nonetheless *were* barred by the latter is germane to our analysis of the regulation hereafter.) The opinions of the Legislative Counsel of California thus would appear to support the validity of the activity fee program at issue here rather than to undermine it.

Recent opinions of the high courts of several other jurisdictions have construed in similar fashion like state constitutional provisions. In *Paulson v. Minidoka County School District No. 331* (1970) 93 Idaho 469, 471 [463 P.2d 935], the Idaho Supreme Court construed a constitutional mandate that " 'it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.' " The provision was held to bar the imposition of mandatory $25 annual fees upon all high school students as a cost of their receiving a transcript of courses studied and grades received upon completion of high school. (*Id.,* at p. 473.) Although the fee was assigned one-half to "Text Book Fees" and one-half to "School Activity Fees," the court noted that partial payment of the fee was not accepted by the school district. Insofar as the fee was charged for textbooks, it was found to infringe the students' right to free education. (*Id.,* at pp. 472-473.) Further, because that portion of the fee assigned to "activities" was charged *whether or not* a student participated in any activity, the court observed that it thereby became a flat charge on attendance at high school, and so was barred for the same reason. (*Id.,* at p. 472.) The rationale for each half of the fee thus was objectionable under traditional analyses of the right to "free common schools."

Most important to the Idaho court's ruling was the manner in which payment of the fee was enforced. Although failure to pay the fee apparently did not actually interfere in any way with a student's progression through the school system—textbooks being provided, grades and credit given and diplomas awarded despite such nonpayment—it was clear that no transcript could be obtained unless the entire fee was paid. Because the school district was under a clear duty, as part of the state's obligation to maintain free schools, to furnish transcripts to eligible graduates, the court concluded that "the $25.00 fee *as it was charged in this case* offended the requirement that the 'common schools' be 'free'." (*Id.,* at p. 471, italics in original.)

Speaking directly on the point with which we are here concerned, however, the Idaho court observed: "But it should be noted that, because social and extra-curricular activities are not necessary elements of a high school career, the constitution does not prohibit appellants from setting fees to cover costs of such activities to be paid by students who wish to exercise

an option to participate in them." (*Id.*, at p. 472.) This discussion is fully consistent with the interpretation of article IX, section 5 herein suggested.

Similarly, in *Granger et al.* v. *Cascade Co. Sch. Dist.* (1972) 159 Mont. 516, 524 [499 P.2d 780], the Montana Supreme Court construed a state constitutional provision requiring the state legislature " 'to establish and maintain a general, uniform and thorough system of public, free, common schools.' " In identifying those activities for which fees could *not* be charged, the court established the following test: "Is a given course or activity reasonably related to a recognized academic and educational goal of the particular school system?" (*Id.*, at p. 527.) If so, the constitutional command for a free public school system barred the charge; if not, "reasonable fees or charges may be imposed." (*Id.*, at p. 528.)

In explaining that its test provided a degree of flexibility, the Montana court declared: "The school may thus define its own academic and educational goals and the *courses and activities that will carry credit toward graduation* within the limits provided by law. At the same time, the individual student has a freedom of choice, within the limits of the educational framework so established, to pursue a course of study directed toward . . . [his personal academic goal] without regard to his financial ability to pay additional fees or charges." (159 Mont. at p. 528, italics added.) The Montana Supreme Court's apparent construction of that state's constitutional guarantee of "free" schools as being limited to credit-bearing courses thus also conforms to my reading of similar constitutional language in the case at bar. (See also *Concerned Parents* v. *Caruthersville Sch. D.* (Mo. 1977) 548 S.W.2d 554, 562 [constitutional requirement of "free public schools for the gratuitous instruction of all persons" interpreted to bar all fees for academic credit courses]; compare *Board of Education* v. *Sinclair* (1974) 65 Wis.2d 179, 187 [222 N.W.2d 143] [constitutional mandate that "schools shall be free and without charge for tuition" allows the charging of textbook fees but prohibits instructional fees for credit courses].)

The foregoing analyses of cases from other jurisdictions thus corroborate the view that article IX, section 5 of the California Constitution does not prohibit a school district from charging a fee for participation in extracurricular activities which neither bear credit toward graduation nor are necessary for progression from grade to grade through the school system.

Plaintiffs also cite Education Code section 37105 in support of their challenge to the activity fee program. That statute does not appear particularly helpful to their position, however. Apart from certain inapplicable exceptions, the statute provides that "No charge for tuition shall be made in any school district of this state . . . ." While "tuition" is not defined by statute,

the common understanding of that term as payment for instruction in a school curriculum and for materials incident thereto would appear to make the statute inapplicable by its terms to the extracurricular activity fees involved here. The same factual finding of the trial court that those extracurricular activities were separable from the regular school curriculum obviously facilitates distinguishing the fees charged for the former activities from "tuition" charges for curricular instruction, which are prohibited. In effect, by enacting section 37105 the Legislature simply appears to have implemented the constitutional mandate that it provide a "free school." In addition, of course, that enactment tends to corroborate the interpretation of the content of the constitutional command as including only those courses whose satisfactory completion can contribute to a student's academic progression and ultimate graduation—in short, credit-bearing courses.

Plaintiffs place their strongest reliance upon an administrative regulation, namely, title 5, section 350 of the California Administrative Code. That regulation, presumably adopted by the State Board of Education pursuant to its general power to "adopt rules and regulations not inconsistent with the laws of this state" (§ 33031), provides: "A pupil enrolled in a school shall not be required to pay any fee, deposit, or other charge not specifically authorized by law." Accompanying that regulation is a note—the origin of which is not specified—which asserts: "Specific authority cited for Section: Section 5 of Article IX, California Constitution."

As previously indicated, however, the constitutional provision cannot be read to bar the extracurricular activity fee at issue; nor is the fee barred by statute. In my view, a regulation which purports to proscribe activity fees which are neither constitutionally nor statutorily prohibited *would* be "inconsistent with the laws of this state" and so beyond the power of the state board to adopt. (See § 33031.)

We have said that "Where a statute empowers an administrative agency to adopt regulations, such regulations 'must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose.' (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 . . .; Gov. Code, § 11342.2.) The task of the reviewing court in such a case ' "is to decide whether the [agency] reasonably interpreted the legislative mandate." [Citation.]' (*Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651, 657 . . . .) Such a limited scope of review constitutes no judicial interference with the administrative discretion in that aspect of the rulemaking function which requires a high degree of technical skill and expertise. [Citation.] Correspondingly, there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute.

"We repeat our admonition expressed in *Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 . . .: 'Our function is to inquire into the legality of the regulations, not their wisdom . . . . Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them.' Acknowledging that the interpretation of a statute by one charged with its administration was entitled to great weight, we nonetheless affirmed: ' "Whatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts." [Citations.] *Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to [,] strike down such regulations.'* (*Id.*, at p. 748.)" (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032], italics added.)

What is true of a regulation which enlarges the scope of a statutory prohibition—and so is fatally inconsistent therewith—would seem equally true where a constitutional mandate is at issue. At the very least, it is clear that the "free school" mandate of article IX, section 5 of the Constitution did not provide independent authority for the promulgation of section 350 by the State Board of Education.

From the foregoing, I conclude that any *absolute* regulatory prohibition against charging a student "any fee, deposit, or other charge"—including such fee for extracurricular activities of the sort involved here—would be neither consistent with, nor reasonably required to effectuate the purpose of, either article IX, section 5 of our Constitution or section 37105. So read, section 350 would be invalid.

Based on the foregoing analysis, I find unpersuasive plaintiffs' argument that certain opinions of the Attorney General support their challenge to the activity fee program. One such opinion, issued in 1962, concluded that mandatory fees for "elective bowling classes" were prohibited by the Constitution and Administrative Code, declaring that "school districts have no authority to charge fees for any classes, elective or compulsory, offered as part of their instructional programs." (39 Ops.Cal.Atty.Gen. 136, 137 (1962).) Read carefully, that opinion would appear to undercut, rather than support, plaintiffs' position; for although it is not stated therein whether credit was awarded for the classes at issue, the fact that they were part of the regular school curriculum—"offered as part of their instructional programs"—would suggest that they were credit-bearing. The Attorney General's determination that fees cannot be charged for a credit course in the regular curriculum, albeit an "elective" course, is completely consistent with the foregoing analysis. His opinion does not purport to forbid the charging of fees for extracurricular activities.

Further, I find inapposite other opinions of the Attorney General cited by plaintiffs which arguably *did* more clearly indicate that the latter fees would be prohibited. It should be carefully noted that such opinions were issued *prior* to the expansion of the powers of local school districts accomplished by the Legislature's adoption of section 35160 in 1976. Prior to that year it generally was understood that local school districts had only those powers which the Legislature had granted to them expressly by statute. (See *San Juan Teachers Assn.* v. *San Juan Unified Sch. Dist.* (1974) 44 Cal.App.3d 232, 250 [118 Cal.Rptr. 662]; *Yreka etc. School Dist.* v. *Siskiyou etc. School Dist.* (1964) 227 Cal.App.2d 666, 670 [39 Cal.Rptr. 112].) In 1976 the Education Code was amended, transforming what had been a "restrictive" code into a "permissive" one. Included in the new provisions was section 35160, which provides: "On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." (That statute was adopted pursuant to specific constitutional authorization therefor effected by the amendment of article IX, section 14 of the Constitution, eff. July 1, 1973.) That sweeping and fundamental legislative enhancement of local decisionmaking power, in my view, renders obsolete earlier opinions of the Attorney General construing local school districts' more limited powers under the earlier, "restrictive" code.

In addition, Attorney General opinions issued *after* the effective date of section 35160 clearly imply that the new code was designed to authorize flexibility in financial, as well as educational, decisions of local school districts. In one such opinion the Attorney General discussed the relief from the constraints of the former Education Code accomplished by the 1976 enactments in the context of section 72233, which affords to community college districts the same broad powers granted to local school districts by section 35160. (See 60 Ops.Cal.Atty.Gen. 353 (1977).) In concluding that the *community college* districts were still bound by the "traditional constraints previously operative upon the authority of school districts" notwithstanding the enactment of section 72233, the Attorney General relied specifically upon a contemporaneously enacted *statute* (§ 72289) which continued to limit the power of community college districts to establish only those fees "it is authorized to establish by law." (*Id.*, at p. 354.) The clear implication of that opinion is that in the absence of the *Legislature's* adoption of the prohibition, community colleges could have charged the fees at issue. Such opinion thus supports a conclusion that in the absence of a comparable *statutory* prohibition against the charging of such fees by local school districts, a regulation which purports to forbid *any* "fee, deposit, or other charge" does not properly implement any state law.

It may be possible, however, to construe section 350 in a less restrictive manner, and so save it. Apparently, that regulation has been in effect in substantially the same form at least since 1940. Thus, when section 350 (or its predecessor) was adopted, its absolute terms conformed to the then prevalent restrictive view of the powers of school boards, and reading the regulation literally created no inconsistency with state law. In view of the substantial modification of state law in 1976, however, reinterpretation of the regulation to conform to that modification is preferable to its invalidation. In short, the Legislature's determination to broaden the powers of local school districts warrants a correspondingly narrowing construction of section 350. By reading that regulation to prohibit only fees for courses bearing credit towards academic progression through the school system and graduation therefrom, we both acknowledge the Legislature's 1976 expansion of the powers of local school districts and construe the regulation harmoniously with the relevant constitutional and statutory provisions. So read, section 350 does not bar the District's fee program for extracurricular activities and retains its vitality.

Plaintiffs' final challenge to the activity fee program is based on equal protection grounds. They assert that the program discriminates on the basis of wealth and so violates article I, section 7 of the California Constitution as construed by us in *Serrano* v. *Priest, supra,* 5 Cal.3d 584. Plaintiffs do not assert that they are denied equal protection as a result of action which allegedly discriminates against them. Rather, as residents of the District, they argue vicariously as to students in other districts, that "similarly situated students of poorer districts unable to raise proportionately equal amounts . . . are deprived of an equal educational opportunity."

Whatever the implications of plaintiffs' inverted posture here, their equal protection argument is faulty for several additional reasons. Implicit in their argument is the assumption that the existence of the District's activity fee program does, in fact, create a disparity between the extracurricular activities available in the District and those available elsewhere. The trial court did not so find and plaintiffs did not challenge that failure to find.

Giving plaintiffs the benefit of the doubt on this factual issue, however, their conclusion that any such disparity denies equal protection to residents of poorer districts rests on the further assumption that extracurricular activities are integral to the educational interest which this court characterized as "fundamental" in *Serrano*. (5 Cal.3d at p. 589.) As already indicated, however, the constitutional "right to an education in our public schools" which we there identified pertained to the opportunity to participate in an "educational system [which] must be uniform in terms of the prescribed course of study and educational progression from grade to grade." (*Id.,* at

p. 596.) But as the trial court found in the case at bar, the extracurricular activities for which a fee is charged are *not* included within the "prescribed course of study" or necessary to "educational progression from grade to grade." That conclusion renders *Serrano*'s equal protection analysis inapposite.

Finally, I note that *Serrano*'s finding of a denial of equal protection in the public school financing system was premised on state action which resulted in unequal treatment of its citizens: "[G]overnmental action *is* the cause of the wealth classifications. The school funding scheme is mandated in every detail by the California Constitution and statutes." (5 Cal.3d at p. 603, italics in original.) "We find that such financing system as presently constituted is not necessary to the attainment of any compelling state interest." (*Id.*, at p. 614.) Accordingly, that state-mandated system was held to deny equal protection. (*Id.*, at pp. 614-615.) In the instant case, in contrast, plaintiffs do not explain how discriminatory state action is involved in the District's self-supporting activity fee program which makes certain extracurricular activities available to all students within the District regardless of ability to pay. The governmental entity here—the District—treats all of its constituents alike in the implementation of its activity fee program. *Serrano* does not aid plaintiffs.

There is a final practical reason sustaining the validity of the activity fee program. The District thereby has made available to its high school students on a nondiscriminatory basis the opportunity to participate in extracurricular athletic competition, musical performances and dramatic productions. Without the program—*and with the full sanction of the law*—the District apparently would have eliminated one or more of those activities. Who seriously can argue that anyone—student or parent, within the District or without—is worse off by the District's choice?

For the foregoing reasons I conclude that a local school district may charge a fee for optional participation by its students in extracurricular activities which bear no credit towards progression from grade to grade within the school system or graduation therefrom, where such participation is not barred by any student's inability to pay. Because the District's activity fee program comes within this formulation, I would affirm the judgment of the trial court which upholds it.