Filed 2/24/22

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| VANNDRYA JASON SROUY,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>  Defendant and Respondent. | D078411<br><br><br>(Super. Ct. No. 37-2019-00010704-CU-NP-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie Sturgeon, Judge. Affirmed.

Law Office of Michael J. Kielty and Michael J. Kielty for Plaintiff and Appellant.

Higgs Fletcher & Mack, John Morris, Steven J. Cologne, Susan M. Hack, Jacob T. Spaid and Rachel M. Garrard for Defendant and Respondent.


INTRODUCTION

Vanndrya Jason Srouy is a graduate of Crawford High School (Crawford) in the San Diego Unified School District (the District). While a student at Crawford, he was a member of its varsity football team. After

Srouy graduated, he found himself named as a co-defendant in a lawsuit filed by a football referee, John Herlich, who claimed to have been injured when Srouy blocked an opponent, who fell into Herlich, during a school football game. (*John Herlich v. Jason Srouy, et al.*, San Diego Superior Court Case No. 37-2016-00032867-CU-PO-CTL) (the *Herlich* lawsuit).) The other defendant, the District, rejected Srouy's tender of his defense in the *Herlich* lawsuit.

Srouy then filed the instant action against the District, claiming the District violated a mandatory duty to defend him in the *Herlich* lawsuit. Srouy alleges this duty arose under the free school guarantee and the equal protection clause of the California Constitution; title 5, section 350 of the California Code of Regulations; and/or Education Code section 44808. The trial court granted the District's demurrer without leave to amend and dismissed Srouy's operative complaint. We are compelled to affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Factual Background*

The allegations of Srouy's operative second amended complaint (SAC) describe the *Herlich* lawsuit in detail. The SAC also attaches and incorporates by reference a number of exhibits.[1] Because this appeal is

---

[1] These exhibits are: the *Herlich* complaint, together with a claim form that Herlich submitted to the District as part of the prelitigation process, and the District's denial of that claim; a statement of damages filed in the *Herlich* lawsuit; a declaration filed by the District in support of a motion for summary judgment in the *Herlich* lawsuit; a minute order in the *Herlich* lawsuit in which the trial court granted Srouy relief from entry of default; and a claim form that Srouy submitted to the District as part of the prelitigation process, together with a letter from the District's lawyers rejecting Srouy's tender of his defense in the *Herlich* lawsuit, a declaration filed by Srouy in support of

2

taken from a ruling sustaining a demurrer, we assume the truth of these allegations to the extent they are properly pleaded. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).) "We also assume the numerous attachments to the [SAC] are true, and they take precedence over any conflicting allegations." (*Nede Mgmt. Inc. v. Aspen American Ins. Co.* (2021) 68 Cal.App.5th 1121, 1127.) The following factual summary is derived from the SAC.

A. *The Injury to Herlich*

Srouy graduated from Crawford in June 2016. Before graduating, he was a member of Crawford's varsity football team. He earned physical education class credit for attending and participating in football team practices and games, and was "given instruction, training and direction by the coaches," who were District employees, "as to what to do, and what his assignment was on each play."

At the time of the 2015 football season, Srouy was a high school senior and had not yet turned 18 years old. On October 16, 2015, Srouy played in a football game that pitted Crawford against Holtville High School (Holtville). Because the Crawford football field was unavailable, the game was held at Lincoln High School, which is also operated by the District. The Crawford football team was transported to and from Lincoln High School in District buses.

During the game, Crawford football coaches called a play in which Srouy was assigned to block an opposing player. Srouy alleges that during the play, he blocked the opposing player, "who then fell onto the back of [a referee's] legs," injuring the referee, Herlich. Srouy was flagged for a late hit

_____

his motion for relief from default in the *Herlich* lawsuit, and the District's denial of Srouy's prelitigation claim.

by a different referee.  However, during a team meeting the next day, "while reviewing the game film," Crawford's head coach "said that he did not think that it was a late hit, and that [Srouy] had done nothing wrong."

B.    *The* Herlich *Lawsuit*

On March 11, 2016, Herlich filed a two-page claim form with the District.  He stated he was an independent contractor for the San Diego County Football Officials Association, which provides officials for District sporting events.  He claimed a Crawford player whom Crawford coaches knew to have a pattern of unsportsmanlike conduct had hit him intentionally during the October 16, 2015 game, and as a result of the hit, he had sustained "tibia/fibula fractures requiring multiple surgeries" and "rotator cuff injuries" that also required surgery.  He sought damages in excess of $25,000.  On April 22, 2016, the District denied the claim.

On September 21, 2016, Herlich filed a complaint in superior court against Srouy and the District.  The complaint contained two causes of action.  In support of the first cause of action, which was asserted against Srouy,[2] Herlich alleged that Srouy "had a custom and practice of

---

[2]    Because we are not sitting in review of the *Herlich* lawsuit and are not in possession of the full record from that case, we are not in a position to comment on its merits.  However, we find it helpful to review certain legal principles that may explain how a high school football player could come to find himself named in a civil suit filed by a referee.  Participants in a sport may be held liable for injuries arising from their conduct during a play, if the conduct falls " 'outside the range of the ordinary activity involved in the sport.' " (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 165 (*Avila*).)  And although Srouy was a minor at the time Herlich was injured, his minority did not shield him from suit.  (Fam. Code, § 6600 ["A minor is civilly liable for a wrong done by the minor, but is not liable in exemplary damages unless at the time of the act the minor was capable of knowing that the act was wrongful."].)  Based on an annotation collecting suits related to claims of injury to or death of an umpire, referee, or judge of a game or

4

unsportsmanlike conduct, including the practice of engaging in late and improper hits, defined as forceful bodily contact after the play has been called dead." He further alleged that during the October 16, 2015 game, after the end of a play, Srouy "intentionally, deliberately, negligently and/or carelessly hit an unidentified Holtville player pushing the Holtville player into the back of [Herlich's] legs, causing [Herlich] to fall and sustain serious injuries and damages."

In support of the second cause of action, asserted against the District, Herlich alleged the District "sponsored, organized, ran and otherwise controlled" the Crawford sports program, including its football team, and had agreed to be bound by the National Federation of State High School Associations (NFHS) football rules, "which prohibit illegal personal contact under Rule 9-4." He further alleged that Crawford coaches knew or should have known that Srouy "had a custom and practice of engaging in unsportsmanlike conduct" and "despite such knowledge, sanctioned, authorized and encouraged" Srouy to play in this manner, "including engaging in late and improper hits in violation of Rule 9-4." Herlich alleged that Crawford's coaches "should have benched" Srouy "or otherwise restricted his play," and that as a result of their failure to do so, Srouy "engaged in illegal personal contact with a Holtville player by charging or throwing the Holtville player into and on top of [Herlich] after the ball was dead," injuring Herlich. In his statement of damages, Herlich claimed his general damages totaled $750,000, and his special damages totaled $250,000.

---

contest, such suits appear to be relatively rare. (Annot., Liability for injury to or death of umpire, referee, or judge of game or contest (1966) 10 A.L.R.3d 446.)

By the time the *Herlich* lawsuit was filed, Srouy had graduated from Crawford. The *Herlich* complaint was served at Srouy's mother's house while Srouy was out of town. Srouy's mother is a refugee from Cambodia who "speaks and reads limited English" and, due to her experiences under the Pol Pot regime, is "cautious" when speaking to "anyone in authority." For his part, Srouy had "no experience with litigation or courts," spoke Khmer at home, and struggled with spoken English. When Srouy returned to San Diego and saw the legal papers, he saw that his "name was on a lawsuit" but otherwise did not understand what the papers meant.

Srouy and his mother went to see Crawford's athletic director, Kelcie Butcher, to ask what to do. According to Srouy, Butcher said Srouy "should try and talk to an attorney," but also told Srouy "not to worry because [Herlich] was not really after [Srouy,] he was after the school district because they had money" and that "the school district's attorneys will take care of it." From this conversation, Srouy believed the District's attorneys "would be representing [him]." He thus took no further action and waited for the next court date of April 21, 2017, which was a "date on the paperwork" he had received.

On April 11, 2017, the attorney representing Herlich filed a request for entry of default against Srouy seeking "an amount in excess of one million dollars." Srouy appeared in superior court with family members, but without an attorney, at the April 21 hearing, which was an initial case management conference. Although he stood alongside the attorneys representing Herlich and the District, the attorneys did not bother to tell Srouy that a default had been entered against him.

More than 10 months later, Srouy received a notice of deposition, served by the District, requiring him to appear for his videotaped deposition

on February 12, 2018. Srouy complied. While the attorneys were making their introductions, Srouy stated that he believed he was being represented by counsel for the District. He learned for the first time that he was not. The deposition was then adjourned so Srouy could "find and hire his own counsel."

Srouy contacted the San Diego County Bar Association's Lawyer Referral and Information Service, and then reached out to attorney Michael J. Kielty, who "agreed to assist and represent [Srouy]." Kielty appeared with Srouy at his rescheduled deposition. Kielty also tendered Srouy's defense to the District. On March 19, 2018, the District, through its outside counsel, rejected the tender.

Kielty also pressed Herlich's attorney to agree to set aside the default entered against Srouy. On March 24, 2018, Herlich's counsel stated he "did not have his client's authority" to set aside the default. Kielty then filed a noticed motion seeking judicial relief from the default. Superior Court Judge John S. Meyer found the equities favored Srouy and set aside the default on the basis of extrinsic mistake. In doing so, Judge Meyer noted Srouy's difficulty with English and inexperience with courts, and observed that although Srouy "may have misunderstood Ms. Butcher" during their conversation about the Herlich lawsuit, "his reliance on what he understood is not unreasonable under these circumstances."

During the course of the *Herlich* lawsuit, the District moved for summary judgment, unsuccessfully. In support of this motion, the District filed a declaration from Butcher, which Srouy attached to the SAC in this case. In this declaration, Butcher averred that before the October 16, 2015 game, "Mr. Srouy had <u>never been accused of unsportsmanlike conduct, including late or improper hits, while a member of the Crawford football team</u>." (Emphasis in original.) She further averred: "At the time of the

7

incident, Mr. Srouy was an undersized senior wide receiver who did not play every play. He only recorded one catch the whole 2015 season. [¶] . . . During the Holtville game, Mr. Srouy's primary duty was to block defensive players from reaching Crawford High School's running backs. Plaintiff's claim arises from a run play where Mr. Srouy was performing blocking support and Crawford was on offense. Mr. Srouy initiated a block on a Holtville defender and the impact caused the Holtville player to fall onto Plaintiff. [¶] . . . Crawford High School coaching staff and I determined that Mr. Srouy's block on a Holtville player who fell onto Plaintiff was not conducted intentionally or maliciously."

On December 3, 2018, shortly before trial, Herlich agreed to dismiss Srouy from the case "in exchange for an agreement to waive costs against Mr. Herlich." On December 10, 2018, the case proceeded to a jury trial on Herlich's remaining cause of action against the District. After counsel gave their opening statements, Herlich and the District settled for $50,000.

## II.

### *Procedural Background*

A.    *The Underlying Complaint*

On August 22, 2018, Srouy filed a two-page claim form with the District seeking recovery of legal fees in his defense in the *Herlich* lawsuit, which he stated were "currently in excess of $50,000."[3] In the claim form, Srouy stated that District employees, including Butcher, had failed to inform him of the potential financial risks associated with playing football for Crawford. He described the event underlying his claim as the District's

---

[3]    In his opening brief on appeal, Srouy states that by the time he was dismissed from the *Herlich* lawsuit, the total amount of his legal fees and costs exceeded $129,000.

March 19 rejection of his tender of defense. On August 29, the District denied Srouy's claim.

On February 27, 2019, Srouy filed the instant suit against the District, alleging the District acted wrongfully when it refused to defend him in the *Herlich* lawsuit. Srouy sought recovery of the legal fees and costs he incurred defending himself from that case.

In his original complaint, Srouy asserted causes of action for negligence, fraud, and implied indemnity. He alleged the District had negligently "failed to protect it[s] student athlete players from financial and legal harm by failing to purchas[e] appropriate insurance to defend" against lawsuits arising from "activities on the playing field." He further alleged Crawford football coaches and administrators had fraudulently withheld their knowledge that the District had a policy of not defending students in lawsuits arising from high school activities. In support of the implied indemnity cause of action, Srouy alleged he had been "controlled by [Crawford] coaching staff" during the play that injured Herlich, and as a result, the District was obligated to defend Srouy when Herlich sued. However, Srouy did not identify a statutory basis for the District's alleged liability under any of these theories.

B.     *The First Amended Complaint*

After conferring with counsel for the District, Srouy filed a first amended complaint (FAC). The FAC asserted just two causes of action: negligence and negligent supervision. It alleged the District had agreed to abide by the California Interscholastic Federation (CIF) Constitution and Bylaws, and that the CIF Constitution and Bylaws contained provisions that imposed certain duties on the District that were "mandatory duties" within

9

the meaning of Government Code section 815.6.[4] The relevant provisions required the District to comport itself with " 'scrupulous integrity,' " and required Crawford's coaches and athletic director to " 'provide safeguards for the welfare of participating athletes.' " Srouy alleged the District had breached the "spirit" of these provisions by failing to defend him in the *Herlich* lawsuit, and that Crawford's coaches and athletic director had likewise breached these provisions by failing to inform him the District would not provide him with a legal defense in the event of a lawsuit.

The District demurred to the FAC. It argued, among other things, that the CIF Constitution and Bylaws were not an " 'enactment' " within the meaning of Government Code section 815.6, and did not impose a mandatory duty to provide a legal defense to students or to warn students of a purported policy not to provide a defense. The trial court agreed and sustained the District's demurrer with leave to amend.

C.    *The Second Amended Complaint*

Srouy then filed the operative SAC. The SAC asserts three causes of action: express indemnity, implied indemnity, and equitable indemnity. Its factual allegations are similar to those of the earlier complaints, but they are more extensive and more detailed. In place of the CIF Constitution and Bylaws, the SAC relies on three new provisions as predicates for the District's alleged mandatory duty liability under Government Code section 815.6.

---

[4]    Government Code section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

10

The first such provision is Education Code section 44808, which states: "Notwithstanding any other provision of this code, no school district, city or county board of education, county superintendent of schools, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district, board, or person has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school–sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances. [¶] In the event of such a specific undertaking, the district, board, or person shall be liable or responsible for the conduct or safety of any pupil only while such pupil is or should be under the immediate and direct supervision of an employee of such district or board." The SAC alleges the District violated Education Code section 44808 by "failing to protect [his] safety and well being [sic] . . . in connection with the aftermath of the October 16, 2015 football game" and by "failing to insure the absence of financial injury to [Srouy] as a result of the *Herlich* lawsuit."

The second provision is article IX, section 5 of the California Constitution, which states: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." Srouy alleges in the SAC that the guarantee of a free school extends to ensuring a student does not incur legal fees and costs from a lawsuit arising from an extracurricular activity for which the student receives class credit.

11

The third provision is title 5, section 350, of the California Code of Regulations, which states: "A pupil enrolled in a school shall not be required to pay any fee, deposit, or other charge not specifically authorized by law." The SAC alleges the attorney fees and costs Srouy incurred in defending against the *Herlich* lawsuit constituted a " 'charge not specifically authorized by law' " that the District failed to prevent him from incurring.

In the prayer for relief in the SAC, Srouy requests, in addition to general damages and costs of suit, a judgment declaring that the District is under a duty to indemnify him "for the full amount of all fees, costs and expenses incurred in [his] defense in the *Herlich* litigation."

D.    *The District Demurs to the SAC*

The District filed a demurrer to the SAC. It argued that none of the provisions on which Srouy relied to hold it liable under Government Code section 815.6 impose a mandatory duty to prevent a student from incurring attorney fees and costs in the defense of a lawsuit. Srouy opposed the demurrer but did not seek leave to amend.

The trial court issued a minute order granting the District's demurrer without leave to amend. The court found Srouy had not succeeded in establishing that the District was under a mandatory duty to "protect or indemnify [him] from incurring attorney fees." The court reasoned that incurring legal fees was not the type of harm that Education Code section 44808 was designed to prevent. The court further found that while article IX, section 5 of the California Constitution, and title 5, section 350 of the California Code of Regulations, prohibit schools from charging students fees to enroll or participate in educational extracurricular activities, they did not obligate schools to prevent students from being "required to pay [an] attorney for fees incurred in representing [the student] in litigation outside of school."

12

The trial court concluded Srouy had failed to allege sufficient facts to constitute a cause of action against the District, and granted the demurrer without leave to amend.  The court later entered a judgment of dismissal, from which Srouy timely appeals.

DISCUSSION

Srouy contends the trial court erred in sustaining the District's demurrer because the allegations of the SAC are sufficient to state a claim based on the District's violation of a mandatory duty to defend him in the *Herlich* lawsuit.

"California follows what is commonly referred to as the American rule, which provides that each party to a lawsuit must ordinarily pay his own attorney fees."  (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.)  "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties[.]"  (Code Civ. Proc., § 1021.)

Srouy effectively contends that three provisions—the free school guarantee of article IX, section 5 of the California Constitution; title 5, section 350 of the California Code of Regulations; and Education Code section 44808—create an exception to the American rule under which the District has a mandatory duty to pay the attorney fees of a student sued by a third party for an incident arising from the student's participation in a school-sponsored athletic game.  We conclude these provisions did not impose a mandatory duty on the District to defend Srouy from the *Herlich* lawsuit.

13

I.

*Relevant Legal Principles*

A.     *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank*, *supra*, 39 Cal.3d at p. 318.)

B.     *Mandatory Duty Liability Under Government Code Section 815.6*

"Except as otherwise provided by statute: [¶] . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity[.]" (Gov. Code, § 815, subd. (a).) Government Code section 815.6 is one of the statutory exceptions to this rule of governmental immunity. It provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6.)

" '[A]pplication of [Government Code] section 815.6 requires that the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken.

14

[Citation.] It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion.' " (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898 (*Guzman*).) Courts construe this requirement "rather strictly, finding a mandatory duty only if the enactment 'affirmatively imposes the duty and provides implementing guidelines.' " (*Ibid.*; see *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1240 (*Clausing*) ["If rules and guidelines for the implementation of an alleged mandatory duty are not set forth in an otherwise prohibitory statute, it cannot create a mandatory duty."].)

"[E]qually important, [Government Code] section 815.6 requires that the mandatory duty be 'designed' to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is ' "one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty." ' " (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 499 (*Haggis*).) Finally, the breach of the duty must have been a proximate cause of the plaintiff's injury. (*Guzman, supra,* 46 Cal.4th at p. 898.)

"The question of whether an enactment is intended to impose a mandatory duty on a public entity to protect against a particular kind of injury is a question of law." (*Clausing, supra,* 221 Cal.App.3d at p. 1239.) Whether a statute provides for a mandatory award of attorney fees is likewise a question of law subject to de novo review. (*James L. Harris Painting & Decorating, Inc. v. West Bay Builders, Inc.* (2015) 239 Cal.App.4th 1214, 1218.)

## II.

*The Free School Guarantee of Article IX, Section 5 of the California Constitution Did Not Create a Mandatory Duty on the Part of the District to Defend Srouy in the* Herlich *Lawsuit*

Since 1879, our state's Constitution has included a free school guarantee. (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 260 (*Arcadia*).) Specifically, article IX, section 5 of the California Constitution (article IX, section 5) provides, "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." The free school guarantee extends to "all educational activities—curricular or 'extracurricular.' " (*Hartzell v. Connell* (1984) 35 Cal.3d 899, 911 (*Hartzell*).)

Here, Srouy contends the District was required to ensure that his participation on the Crawford varsity football team was "free," and the District violated this constitutional obligation when it failed to accept his tender of defense in the *Herlich* lawsuit, thereby causing him to incur substantial expenses attributable to his participation on the team. Although no case has interpreted the free school guarantee to require a school district to provide its students a free legal defense, Srouy contends this result is compelled by the plain language of the guarantee, on the theory that "free must mean free."

At the outset, the parties dispute whether the free school guarantee of article IX, section 5 is "mandatory" or "self-executing." Srouy argues the free school clause is both mandatory and self-executing, noting that under article I, section 26 of the California Constitution, all provisions of our state Constitution "are *mandatory* and prohibitory, unless by express words they

16

are declared to be otherwise." (Italics added.) Srouy's argument falls short, however, because he overlooks that " '[a] [constitutional] provision may be mandatory without being self-executing.' " (*Clausing*, *supra*, 221 Cal.App.3d at p. 1236, fn. 5.)

The District, on the other hand, argues that article IX, section 5 is not mandatory or self-executing. However, the three cases on which it relies either address this point in dicta, or are distinguishable. (*People ex rel. Beckwith v. Board of Education* (1880) 55 Cal. 331, 334 [action for writ of mandate directing school board to use a particular series of textbooks; observing that "[s]everal portions of article [IX] are not self-executing; for instance, § 5"]; *Gonzales v. State of California* (1972) 29 Cal.App.3d 585, 592 [holding the state was a distinct government entity from the school district and was not liable for personal injuries incurred when plaintiff was stricken by a bus driven by a school district employee; reasoning, in part, that there was "no constitutional provision directing or authorizing the state to operate school buses" and "[e]ven assuming the duty of the state to educate its children encompasses their transportation to school, the constitutional provisions imposing this duty are not self-executing"]; *Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 902, 916 [holding that sections 1 and 5 of article IX of the California Constitution do not provide a judicially-enforceable right to an education of " 'some quality' " for all public school children].)

Not only are the parties' arguments off the mark, but it is also unclear what, precisely, each side is attempting to demonstrate, as neither side explains what it means by "self-executing." This term has more than one possible meaning: it can refer to " 'the question whether a clause is *judicially* enforceable at all,' " or it can refer to the question of whether the

17

constitutional provision in question " 'provides [for] rules or procedures by which its declaration of rights is to be enforced, and, in particular, whether it provides citizens with a specific *remedy* by way of damages for its violation in the absence of legislation granting such a remedy.' " (*Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 307 fn. 4.) As one appellate court has explained, the "self-executing analysis differs depending upon the relief sought." (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 728.) The *Katzberg* court ultimately eschewed the " 'self-executing' terminology" because it found the term "potentially confusing" in the context of a constitutional claim seeking monetary recovery. (*Katzberg,* at p. 307, fn. 4.) It promulgated a comprehensive test for "determining the existence of a damages action to remedy an asserted constitutional violation" that entails consideration of "the language and history of the constitutional provision . . . as well as any pertinent common law history" and, if necessary, "the 'constitutional tort' analysis adopted by *Bivens* [*v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388] and its progeny."' (*Id.* at p. 317; see *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 602 [describing the *Katzberg* analysis as "exhaustive"].)

Ultimately, we find it unnecessary to determine whether or not the free school guarantee is self-executing. Our high court has enforced the free school guarantee, leaving little room for doubt that the guarantee is judicially enforceable. (*Hartzell, supra,* 35 Cal.3d at pp. 911–913.) Even if we assume the free school guarantee supports an individual right of action for monetary recovery, we conclude Srouy cannot rely on it to hold the District liable for his defense costs, because the free school guarantee was not designed to prevent this kind of injury. (*Haggis, supra,* 22 Cal.4th at p. 499 [to support mandatory duty liability, "[t]he plaintiff must show the injury is ' "one of the

18

consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty" ' "].)  As we explain, legal expenses like those Srouy incurred in defending the *Herlich* lawsuit do not fall within the free school guarantee, because they are not " 'educational' in character."  (See *Hartzell*, *supra*, 35 Cal.3d at p. 911; *Arcadia*, *supra*, 2 Cal.4th at p. 262.)

In *Hartzell*, our high court considered whether a school district violated the free school clause when it imposed fees for participation in extracurricular activities, including athletic teams, dramatic productions, and music groups.  (*Hartzell*, *supra*, 35 Cal.3d at p. 904.)  The trial court rejected the plaintiffs' claims, primarily because the activities covered by the fee program did not provide school credit.  (*Ibid*.)  Our high court rejected this approach in favor of an analysis that relied on "the educational character of the activities in question," rather than the "formalities of credit."  (*Id.* at p. 909.)  Turning to the particular programs for which the district imposed fees, the Court found they "constitute an integral component of public education," are " ' "generally recognized as a fundamental ingredient of the educational process," ' " and teach "particular skills" in addition to contributing to " 'the making of good citizens physically, mentally, and morally.' "  (*Id.* at pp. 909, 911.)  The programs were thus " *'educational' in character*," leading to the conclusion that they were within the free school guarantee.  (*Id.* at p. 911, italics added.)

In *Arcadia*, our high court applied the "educational in character" analysis to the question of whether an Education Code provision authorizing school districts to charge students for transportation to and from school violated the free school guarantee.  The plaintiff argued that "school-provided transportation, although not educational in character, is nonetheless covered by *Hartzell*'s understanding of the free school guarantee because it is an

19

'integral fundamental part of [ ] elementary and secondary education,' or a 'necessary element[ ] of any school's activity.' " (*Arcadia, supra,* 2 Cal.4th at p. 261.)

The *Arcadia* court found the plaintiff's argument focused too narrowly on select aspects of *Hartzell*'s reasoning. The Court explained that in *Hartzell*, it looked at "whether an activity is an integral, fundamental part of education or a necessary element of any school's activity, specifically *because* that approach focuses 'upon *the educational character of the activities in question.*' " (*Arcadia, supra,* 2 Cal.4th at p. 262.) "Although in *Hartzell* [the high court] adopted a broad understanding of what activities are protected as educational, [it] did not extend that expansive understanding of the free school clause *beyond the realm of educational activities to noneducational supplemental services.*" (*Id.* at pp. 262–263, italics added.) The Court reasoned: "Students are not required to use the same means of transportation as their classmates in order to get to school to receive an education; individual students may choose different modes of transportation to suit their own circumstances. Unlike textbooks or teachers' salaries, transportation is not an expense peculiar to education. Without doubt, school-provided transportation may enhance or be useful to school activity, but it is not a necessary element which each student must utilize or be denied the opportunity to receive an education." (*Id.* at pp. 263–264.) Because transportation to and from school was noneducational, it was not encompassed by the free school guarantee. (*Id.* at p. 263.)

*Hartzell* and *Arcadia* compel us to conclude the District was not under a mandatory duty to provide Srouy a legal defense as part of the free school guarantee. Although the *Herlich* lawsuit arose from an incident that occurred during an extracurricular activity that *itself* qualified as

20

educational, the lawsuit was plainly not an educational activity. A civil suit proceeds in a judicial forum, not an educational one, under its own distinct statutes and rules. The student, in this context, is primarily a litigant; his status as a student is relevant only insofar as he *was* a student at the time of the underlying event.

And while a legal defense to such a suit is undoubtedly both "useful" and "necessary" to the student with the misfortune of being sued, it "is not an expense peculiar to education" and "is not a necessary element which each student must utilize or be denied the opportunity to receive an education." (*Arcadia*, *supra*, 2 Cal.4th at p. 264.) The relationship between the ability to fully participate in school on the one hand, and legal representation in a civil personal injury suit on the other, is more attenuated than the relationship between school transportation and the ability to fully participate in school. If transportation to and from school is a "noneducational supplemental service[ ]" (*id.* at p. 263), the provision of a legal defense, even to a suit against a student seeking damages for an incident occurring during a school-sponsored athletic game, is simply "noneducational" (*Ibid*).

We therefore conclude that a legal defense to a civil suit is not "educational in character," and it therefore falls outside the free school guarantee.[5] Accordingly, Srouy cannot state a claim against the District

---

[5] Srouy relies on *Bostock v. Clayton County* (2020) 140 S.Ct. 1731 for the general proposition that the plain terms of an unambiguous statute trump any "extratextual consideration[s]" that might lead to a different meaning. (*Id.* at p. 1749.) Essentially, Srouy contends that we should conclude, in reliance on *Bostock*, that our state's constitution guarantees an education that is "free" in all respects, full stop. We decline Srouy's invitation to reach this conclusion in reliance on *Bostock*, which involved interpretation of the statutory term "sex" in Title VII of the Civil Rights Act of 1964. Neither this word nor this federal law is at issue here. (See, e.g., *People v. Banks* (1993) 6 Cal.4th 926, 945 ["It is well settled that language contained in a judicial

based on an alleged mandatory duty to provide him a defense to the *Herlich* lawsuit under article IX, section 5.

III.

*Title 5, Section 350 of the California Code of Regulations Did Not Create a Mandatory Duty to Defend Srouy in the Herlich Lawsuit*

Next, Srouy contends that he sufficiently stated a claim against the District for violation of title 5, section 350 of the California Code of Regulations (title 5, section 350), which provides: "A pupil enrolled in a school shall not be required to pay any fee, deposit, or other charge not specifically authorized by law." Srouy argues the District's refusal to defend him in the *Herlich* lawsuit resulted in his incurring a prohibited "charge" for participation in his school football team in the form of legal fees and costs.

We disagree that the "charge[s]" prohibited by title 5, section 350 can be interpreted as extending to costs of litigation, even those incurred in a suit arising from participation in a school sport. "A note appended to title 5, section 350 cites article IX, section 5 of the Constitution (the 'free school' guarantee) as its specific basis of authority." (*Hartzell, supra*, 35 Cal.3d at p. 914.) For the same reasons the costs of defending a student against a civil lawsuit do not fall within the free school guarantee, such costs cannot reasonably be construed as a "charge" for participation in school athletics within the meaning of this regulation.

In *Hartzell*, the Supreme Court described in detail the constructions given this regulation by the Legislative Counsel and the Department of

opinion is ' "to be understood in the light of the facts and issue then before the court, and an opinion is not authority for a proposition not therein considered." ' "].) The free school guarantee is a matter of state law on which our Supreme Court's jurisprudence in *Hartzell* and *Arcadia* is controlling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

22

Education.  (*Hartzell*, *supra*, 35 Cal.3d at pp. 913–914.)  The Court noted that title 5, section 350 had been construed as barring school districts from "charging fees for educational extracurricular activities," as prohibiting fees for "musical instruments used in extracurricular band, special uniforms used in extracurricular activities," and as prohibiting fees "as a condition of participation in 'athletic or other activities' sponsored by a school."  (*Hartzell*, at pp. 913–914.)  The fee incurred for obtaining legal representation in a civil lawsuit is unlike any of the fees and charges that the *Hartzell* court identified as prohibited by the regulation.  Further, Srouy did not incur the legal costs until after he had finished participating on the football team, at a time when he was no longer "[a] pupil enrolled in a school."  (Cal. Code Regs., tit. 5, § 350.)  It follows that the amounts Srouy was required to expend did not fall within the scope of title 5, section 350.

Thus, we conclude the District did not have a mandatory duty to defend Srouy in the *Herlich* lawsuit by virtue of this regulation.

IV.

*Education Code Section 44808 Did Not Create a Mandatory Duty to Defend Srouy in the* Herlich *Lawsuit*

Srouy contends the SAC sufficiently alleged a cause of action for indemnification of his legal fees and costs in the *Herlich* lawsuit based on the theory that the District owed him a duty to defend under Education Code section 44808.  We must reject this contention as well.

A.     *Legal Principles*

Since the early days of state laws regulating schools, teachers, coaches, and other school officials have been required to exercise reasonable care in the supervision of students.  (See *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747 (*Dailey*) ["California law has long imposed on school

23

authorities a duty to 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection.' "]; *Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 (*Taylor*) [in action under former School Code section 2.801, school authorities held negligent for failing to take precautions to minimize known danger to students from delivery trucks that frequented school grounds]; *Goodman v. Pasadena City High School Dist.* (1935) 4 Cal.App.2d 65, 68 (*Goodman*) [in action under former School Code section 2.801, plaintiff's eye injury from a flying piece of aluminum in metal shop class held not attributable to the negligence of any school authority]; see also 5 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 383, p. 588 [discussing former section 903 of the Education Code].)

The relevant standard of care to which school authorities were held was the care that " 'a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstan[c]es.' " (*Dailey*, *supra*, 2 Cal.3d at p. 747.) School districts were understood to be vicariously liable for injuries proximately caused by such negligence. (*Ibid.*) At the same time, it was uniformly recognized that school districts and their employees were not "insurers of the physical safety of students." (*Ibid.*; *Taylor*, *supra*, 17 Cal.2d at p. 602 [observing that challenged jury instruction did not erroneously "make the school district an insurer of the safety of its pupils"]; *Goodman*, *supra*, 4 Cal.App.2d at p. 68 [" '[t]he law does not make school districts insurers of the safety of the pupils at play or elsewhere' "].)

These principles were carried over into the interpretation of Education Code former section 13557—the statutory precursor to current Education Code section 44807—which requires public school teachers to "hold pupils to a strict account for their conduct on the way to and from school, on the

playgrounds, or during recess." (See *Dailey*, *supra*, 2 Cal.3d at p. 747 [action under former section 13557 of the Education Code].) In *Dailey*, our high court reiterated that the "standard of care imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstan[c]es.' " (*Ibid.*) Applying this standard, the *Dailey* court held that a school district was vicariously liable for its physical education instructors' negligent failure to supervise an area just outside the gymnasium, where a slap-boxing match between two teenage students resulted in one of them suffering a fatal head injury. (*Id.* at pp. 748–751.)

Education Code section 44807, which has been construed as governing activities on school grounds, has been described as "impos[ing] on school authorities a general duty to supervise pupils on school property during school hours in order to ' "regulate their conduct so as to prevent disorderly and dangerous practices which are likely to result in physical injury to immature scholars under their custody." ' " (*Lilley v. Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, 945.) At the same time, this statute " 'does not make school districts insurers of the safety of pupils at play or elsewhere' [citation], and, by its terms, section 44807 does not purport to impose a duty on teachers to insure students against the risks of injury inherent in the participation in extracurricular school sports." (*Ibid.*)

And in the context of school sports, our high court has held that the duty owed by a sports instructor or coach of a school athletic team is reduced, in light of the risk of harm inherent in the sport. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1006–1007.) Thus, a sports

25

instructor or coach "[does] not have a duty to eliminate the risks presented by a sport" nor to "eliminate all the risks presented by inexperience" (*id.* at pp. 1006, 1011), but "[does] have a duty to the student not to increase the risk inherent in learning, practicing, or performing in the sport" (*id.* at p. 1006). Thus, a sports instructor or coach cannot be held liable unless it is alleged and proved "that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching the sport." (*Id.* at p. 1011.)

Education Code section 44808 governs activities outside of school grounds. It provides: "Notwithstanding any other provision of this code, no school district, city or county board of education, county superintendent of schools, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district, board, or person has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school–sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances. [¶] In the event of such a specific undertaking, the district, board, or person shall be liable or responsible for the conduct or safety of any pupil only while such pupil is or should be under the immediate and direct supervision of an employee of such district or board."

Our high court has explained that this provision was enacted with the intention of limiting the circumstances under which a school district is responsible for supervising students. (See *Hoyem v. Manhattan Beach City*

*School Dist.* (1978) 22 Cal.3d 508, 517–518.)  Education Code section 44808 has been interpreted to grant school districts immunity from liability " ' "unless a student was (or should have been) directly supervised during a specified undertaking." ' " (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1358.)  Thus, "school districts are not responsible for the safety of students outside school property absent a specific undertaking by the school district and direct supervision by a district employee." (*Ibid.*)  The relevant standard of care to which the school district and its employees are held is a standard of "reasonable care."  (Ed. Code, § 44808; *Cerna*, at p. 1358; see *Farley v. El Tejon Unified School Dist.* (1990) 225 Cal.App.3d 371, 376 [in action for wrongful death of a student based on negligent operation of a school bus, "Education Code section 44808 is simply a recognition by the Legislature of the law existing prior to its enactment that once a school district undertakes to provide transportation for its pupils it has a duty to exercise reasonable care under the circumstances"].)  Under Education Code section 44808, it remains the case that school districts and their employees are not " 'considered insurers of the physical safety of their students.' " (*Cerna*, at p. 1352.)

B.  *The District Did Not Owe Srouy a Duty to Defend Pursuant to Education Code Section 44808*

With these principles in mind, we turn to Srouy's specific contentions on appeal.  Srouy's first argument is that "if the [District] was responsible for the conduct of [Srouy], then the [District] should have defended [Srouy] in the [u]nderlying [*Herlich*] [l]awsuit."  This argument focuses on the word "conduct" in the statutory phrase "liable or responsible for the *conduct or safety* of any pupil[.]"  (Ed. Code, § 44808, italics added.)  Srouy observes that Education Code section 44808 makes the District "responsible for the conduct" of a student while that student is under the "immediate and direct

27

supervision of an employee of such district." (See *ibid.*) He then argues that because he was under the " 'immediate and direct supervision' " of Crawford coaches during the play in question, the District was " 'responsible' for [Srouy's] 'conduct,' " a responsibility that he asserts extended to providing him a legal defense when his conduct resulted in a lawsuit. Srouy does not allege in the SAC, nor does he assert on appeal, that his coaches failed to exercise reasonable care in supervising him during the game. Rather, Srouy asserts that by virtue of the fact that he was under their supervision when he committed the "conduct" that resulted in Herlich's injury, the District "ha[d] an obligation to defend that conduct."

Srouy's second argument is based on the statutory word "safety." He argues the District violated Education Code section 44808 "by failing to protect [his] safety and wellbeing . . . in connection with the aftermath of the October 16, 2015 football game . . . [by] failing to insure the absence of financial injury to [Srouy] as a result of the [u]nderlying [*Herlich*] [l]awsuit."

Neither of Srouy's positions presents a tenable interpretation of Education Code section 44808.[6] As we have discussed, California has never put schools in the position of insuring student safety. And yet Srouy's interpretation of Education Code section 44808 would effectively thrust the District into the role of a liability insurer by obligating the District, *even in the absence of any fault on its part*, to protect students from the legal and

---

[6]    Although the Crawford-Holtville football game took place at Lincoln High School, which was within the District, the parties appear to agree that the game falls within Education Code section 44808, the theory apparently being that it was an "away" game that occurred off of the Crawford home campus. As this issue is undisputed and it does not materially affect the duty owed by the District, we accept the parties' position that Education Code section 44808 is the governing provision.

28

financial consequences of conduct they commit while under a District employee's supervision. (See Civ. Code, § 2778, subd. (3) ["An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion."].) Nothing about the history of Education Code section 44808, and nothing about the interpretations accorded it since its enactment, indicates it was intended to broaden the scope of school district liability at all, much less to the extent Srouy urges here. Moreover, Srouy's reliance on the term "conduct" in Education Code section 44808 ignores that Education Code section 44807 uses the same term, "conduct," and yet it has not been interpreted expansively so as to impose liability in the absence of negligence on the part of the school. (See Ed. Code, § 44807 ["Every teacher in the public schools shall hold pupils to a strict account for their *conduct*[.]" (Italics added.)].)

Moreover, although Herlich accused Srouy of unsportsmanlike conduct during the play in question, and blamed his coaches for failing to restrict his play, Srouy has taken a different position in his case against the District. Srouy alleges he was playing "carefully" and, by comparing his situation to the hypothetical basketball player whose long pass misses the mark and unexpectedly hits a bystander, characterizes the events that resulted in Herlich's injury as accidental. He observes that after the game, his coaches told him he had done nothing wrong, and that Butcher, the high school athletic director, stated Srouy had never been accused of late or improper hits and that she had concluded Srouy's block on the opposing player was not intentional or malicious. Although Srouy alleges he was under his coaches' control during the game, he does not allege that his coaches told or

29

encouraged him to violate the rules, or that their supervision during the game otherwise fell below the relevant standard of care. His factual allegations thus do not establish that these school employees "failed to exercise reasonable care" in supervising him during the game, as required to establish a violation of Education Code section 44808.

C. *Srouy's Additional Arguments in Favor of Liability Under Education Code Section 44808 Lack Merit*

Srouy advances a number of additional reasons why he has sufficiently stated a claim against the District for violation of a mandatory duty imposed by Education Code section 44808, but they all lack merit.

In his opening brief on appeal, Srouy asserts the District could have "protected" him in a number of ways, such as "requiring a waiver of claims [on referees] or imposing an arbitration requirement [on referees]," or "obtaining insurance covering its players." We have reviewed the SAC and do not find any allegations to this effect. Even if such allegations did appear in the SAC, Srouy does not allege that requiring a waiver of claims or imposing an arbitration requirement are a standard school practice such that the District's asserted failure to institute such measures here fell below the standard of care. He also does not assert that these steps would have prevented a lawsuit or protected him from incurring legal fees.

As for the possibility of the District obtaining insurance that might have provided him a defense from the *Herlich* lawsuit, Srouy does not identify a law requiring school districts to provide student athletes with third-party liability insurance. As Srouy acknowledges, Education Code section 32221 obligates the governing board of each school district to provide members of athletic teams coverage for *medical expenses* "arising while the members are engaged in or are preparing for an athletic event . . . or while the members are being transported by . . . [school districts] to or from school

30

. . . and the place of the athletic event." Educational institutions are not precluded from providing broader or additional insurance coverage, but the decision to provide broader or additional coverage is discretionary. (Ed. Code, § 32223.) Mandatory duty liability cannot be imposed based on an enactment that is " 'merely discretionary or permissive.' " (*Guzman*, *supra*, 46 Cal.4th at p. 898.) Since Education Code section 32223 makes the provision of insurance coverage other than medical coverage discretionary, Srouy cannot base a claim for mandatory duty liability on the District's asserted failure to provide liability insurance coverage to student athletes.

Srouy's next argument relies on Government Code section 810.8, which provides, " 'Injury' means death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, reputation, character, feelings or estate, of such nature that it would be actionable if inflicted by a private person." Srouy asserts the term "injury" should be interpreted expansively to include more than "just physical injury" and should include "mental and psychological injury," such as he experienced when he was "required to take on a debt to pay for legal fees and costs." We reject this argument, because Government Code section 810.8 supplies a definition to be used in interpreting other provisions, and does not itself create a mandatory duty that might support liability under Government Code section 815.6.

Next, Srouy contends the District should be held liable for his attorney fees under a theory of respondeat superior. He asserts that "the coach should be considered the principal, and the student athlete as the agent." He concludes that "[t]he [District] is thus liable for the cost incurred by [Srouy] to defend himself as a result of following the directions of the [District]." It appears Srouy may be attempting to bring himself within the ambit of

31

Government Code provisions requiring public entities to defend their employees. (See, e.g., Gov. Code, §§ 825, 996.4.) However, Srouy was not an employee of the school. Accordingly, he cannot assert that the District owed him a mandatory duty to defend under provisions governing the duty to defend an employee.

Finally, Srouy claims he was "never warned or informed" that he would not be defended by the District in the event of a suit, and that he "thus did not know that by playing on the football team for school credit he was potentially subjecting himself . . . to financial ruin." We do not disagree with the wisdom of informing student athletes (and their parents) of their potential exposure to litigation arising from participation in school-sponsored sports or that the District may not defend its student athletes in such litigation. However, for several reasons, we are unable to conclude that the District's failure to provide such notice could subject it to mandatory duty liability for Srouy's defense costs when he was sued.

First, Srouy does not allege in his SAC, nor does he assert on appeal, that it is a standard practice for school football coaches or other school officials to provide student athletes with such notice. Srouy also does not assert that his coaches or other school officials were aware of facts that would have alerted them that Srouy, in particular, was in need of such notification. Srouy thus fails to establish that his coaches or athletic director fell below any relevant standard of care by failing to take these steps. (Ed. Code, § 44808 [school district must "exercise reasonable care"]; cf. *Avila, supra,* 38 Cal.4th at p. 162 [school coaches "have a duty not to increase the risks inherent in sports participation"].)

Second, we observe that under current law, in connection with their obligation to provide medical insurance coverage to student athletes, school

32

districts that operate interscholastic athletic teams are required to provide a written notice to school team members, the contents of which are statutorily prescribed. (Ed. Code, § 32221.5.) These notices must inform team members that they "may qualify to enroll in no-cost or low-cost local, state, or federally sponsored health insurance programs" and must provide toll-free telephone numbers where the team members can obtain information about such programs. (See Ed. Code, § 32221.5, subds. (a), (c).) However, school districts may, but are not required to, provide other forms of insurance coverage, and there is no statute comparable to Education Code section 32221.5 that obligates school districts to provide athletic team members information about other insurance protection through which they might protect themselves from other types of harm. The absence of such legislation lends further support to the conclusion that the District was not under a mandatory duty to warn students about a need to defend themselves from possible litigation.

Third, holding the District liable for Srouy's attorney fees under such a failure to warn theory—i.e., allowing a student to recover his attorney fees on the theory his coach failed to warn him of the possibility of incurring such fees in the event of a lawsuit—would result in a significant judicial expansion of the scope of civil liability for attorney fees. As we have noted, California law provides that parties to civil litigation are generally responsible for their own attorney fees. (Code Civ. Proc., § 1021.) Nonstatutory exceptions to this rule include the " 'common fund' " theory (see *Serrano v. Priest* (1977) 20 Cal.3d 25, 35), the " 'substantial benefit' " theory (see *id.* at p. 38), and the " 'tort of another' " theory (see *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507; *Watson v. Department of Transportation* (1998) 68 Cal.App.4th 885, 894 [tort of another doctrine does not allow an exonerated alleged tortfeasor to recover his attorney fees from the liable defendant]).

The California Supreme Court has stated that it has " 'moved cautiously in expanding the nonstatutory bases on which awards of attorney's fees may be predicated,' " observing that to do so has a tendency to "open a ' "Pandora's Box" of prolonged litigation.' " (*Gray*, at p. 507.)  Accordingly, we decline to hold that the District was under a mandatory duty to defend Srouy from the *Herlich* lawsuit based on its alleged failure to warn Srouy of the possibility he could be sued and incur attorney fees.

V.

*Srouy Fails to Establish He Has a Viable Claim for Mandatory Duty Liability Against the District Under the Equal Protection Clause of the California Constitution*

For the first time on appeal, Srouy contends the SAC states a claim, or can be amended to state a claim, for violation of the equal protection clause of the California Constitution.  (Cal. Const., art. I, § 7, subd. (a) ["A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."].)  Relying in large part on Chief Justice Bird's concurring opinion in *Hartzell*, *supra*, 35 Cal.3d at pages 921 to 928, Srouy argues the "costs which the [District] caused [him] to incur [in his defense] violate the equal protection guarantee" because imposition of such costs "creates a group of [haves] (those with insurance and/or financial resources to defend . . . litigation), and [have-nots] (those without any insurance and/or financial resources to defend such litigation)."  The District, in its responsive brief, does not address this argument.

"Generally, a party is not permitted 'to change [his] position and adopt a new and different theory on appeal' because doing so would be unfair both to the court and to the opposing litigant."  (*Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 85.)  "However, the appeal of a judgment of

34

dismissal after sustaining of a demurrer without leave to amend requires the consideration of whether the allegations state a cause of action under any legal theory. [Citation.] Under these circumstances, new theories may be advanced for the first time on appeal." (*Ibid.*) Therefore, we may consider the merits of Srouy's equal protection claim. Although the District failed to present argument on this point in its response brief, the burden of proving the possibility of amending the operative complaint to state a claim is on Srouy. (*Blank, supra,* 39 Cal.3d at p. 318.)

We conclude Srouy has not established a potential claim against the District for violation of our state's equal protection clause. The equal protection clause of the California Constitution does not afford litigants a right to recover individual monetary damages. (*Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 521–525.) The SAC seeks a judicial declaration that the District is obligated to indemnify Srouy "for the full amount" of his legal fees and costs in the *Herlich* lawsuit. However, "a declaration of the scope of a defendant's duty is a statement of law" (*Avila, supra,* 38 Cal.4th at p. 165, fn. 12), and Srouy's requested declaration would be contrary to the law, because the equal protection clause does not support such a monetary recovery. In his appellate briefs, Srouy does not indicate he will change his allegations to seek a different remedy. Instead, he professes that he can recover his costs under an equal protection theory. *Gates* forecloses the possibility of relying on the equal protection clause of the California Constitution to obtain such relief.

Accordingly, Srouy has not demonstrated that he has a viable equal protection claim against the District.

## VI.

### *Conclusion*

Although Srouy's plight evokes our sympathy, our ability to respond is constrained by the law, and the allegations of this case do not afford a judicial solution. We leave it to the Legislature to determine whether the needs of student athletes in Srouy's position are sufficiently addressed by current law, and if not, to craft an appropriate solution.

### DISPOSITION

The judgment is affirmed. Each side shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

DO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

36